UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - v. -

DARCY WEDD,
ERDOLO EROMO,
CHRISTOPHER GOFF,
MICHAEL PEARSE,
YONGCHAO LIU,
    a/k/a "Kevin Liu,"
YONG JASON LEE,
    a/k/a "Jason Lee,"

        Defendants.

- - - - - - - - - - - - - - X

*JUDGE FORREST*

**SEALED INDICTMENT**

**15 CRIM 616**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|9|15
```

## COUNT ONE

### (Conspiracy to Commit Wire Fraud and Mail Fraud)

    The Grand Jury charges:

### Overview of the Fraud Scheme

    1.    From at least in or about 2011, up through and including in or about 2013, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and other co-conspirators not named as defendants herein, engaged in a multi-million dollar scheme to defraud mobile phone customers, including customers in the Southern District of New York, by placing unauthorized charges for premium text messaging services on the consumers' cellular phone bills through a practice known as "auto-subscribing."

2.    To carry out the auto-subscribing scheme, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, caused unsolicited text messages to be sent to mobile phone users offering subscriptions to receive recurring text messages containing content such as horoscopes, celebrity gossip, or trivia facts.  The mobile phone users who received the unsolicited text messages typically ignored or deleted the messages, often believing them to be spam.  These consumers almost never affirmed their interest in these services at any point.  Nevertheless, these consumers were billed or "auto-subscribed" for these services, which were known in the industry as premium text messaging ("Premium SMS") services, at a rate of $9.99 per month, even though they had never ordered them. The $9.99 charge recurred each month unless and until consumers noticed the charges and took action to unsubscribe.  Even then, consumers' attempts to dispute the charges and obtain refunds were often unsuccessful.

3.    DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, also took steps to conceal the fraud scheme.  For example, PEARSE and LIU developed a computer platform that could auto-subscribe consumers in a way that made it appear to the mobile phone carriers and industry compliance groups that the

consumers had, in fact, validly authorized the subscriptions, when in truth, they had not.   In addition, WEDD, EROMO, and GOFF used shell companies to receive payments for their role in the fraud scheme, and/or received their payments in cash.

4.   The fraud scheme generated tens of millions of dollars in proceeds, which DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and other co-conspirators not named as defendants herein, apportioned among themselves.   Some of proceeds were used to fund a lavish lifestyle of, among other things, expensive vacations and gambling.

## The Premium SMS Industry

5.   In the Premium SMS industry, companies that offer Premium SMS services are often referred to as digital "content providers."   Each service or "offer" that is marketed by a content provider is assigned a five or six digit number called a "short code."

6.   Companies known as mobile "aggregators," serve as the middlemen between content providers and the mobile phone carriers. Aggregators have access to the carriers' billing infrastructure and it is their job to assemble, or "aggregate," all of the monthly charges incurred by a particular mobile phone customer for Premium SMS services onto that customer's phone bill.   Content providers give the monthly billing data for their short codes to the

aggregators.   The aggregators, in turn, place those charges on the appropriate mobile phone bills.   The carriers then send out the bills containing the Premium SMS charges to the mobile phone customers and collect payment.

7.   The carriers, the aggregators, and the content providers share the revenue generated by the Premium SMS subscriptions.   The exact revenue split is determined by the particular agreements negotiated between the parties.   Often the carriers can collect between 40%-50% of the revenue generated, the aggregators can collect between 25%-35%, and the content providers collect the remaining portion.

8.   It is standard industry practice in the Premium SMS industry to require that consumers take two steps to confirm a purchase of a Premium SMS service.   This practice is known as "double opt-in" verification.   For example, a content provider typically advertises to consumers over the Internet, and instructs them how to order the Premium SMS service via text message.   The consumer then sends a text message from his or her mobile phone to the short code associated with that service (the first opt-in), and receives in response a text message describing how to opt-in to the subscription service.   Typically, the consumer must then reply to the text message with a key word or PIN number, or enter the key word or PIN number onto a website (the second opt-in).   Once the consumer has opted-in

-4-

through the double opt-in process, the consumer is enrolled in the content provider's Premium SMS service, and the charges will begin to appear on the consumer's mobile phone bill.

9.   As set forth herein, in the course of the auto-subscribing scheme carried out by DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, consumers never affirmed their interest in the Premium SMS services at any point, let alone through double opt-in verification.

10.   Before a content provider can begin marketing a particular Premium SMS service through its associated short code to mobile phone users - sometimes called a "short code campaign" - the short code campaign must first be reviewed and approved by the mobile telephone carriers for compliance with mobile industry marketing standards and practices.  Mobile telephone carriers, mobile aggregators, and mobile industry compliance groups then monitor approved short code campaigns to ensure that they remain compliant by keeping track of certain data such as subscription rates, refund rates, and the number of customer complaints.

11.   If the data collected about a particular short code campaign indicates that the campaign is non-compliant, the carriers and/or the compliance groups will often initiate an audit of the short code by requesting additional information from the aggregators to

verify, among other things, that the subscriptions are the result of genuine double opt-in verification by the consumers.  If the audit results indicate fraudulent or deceptive conduct or non-compliance with mobile industry standards, the carriers and compliance groups can take several remedial steps, including suspending the short code for a period of time or terminating the short code entirely.

## The Defendants and Their Companies

12.   At all times relevant to this Indictment, DARCY WEDD, ERDOLO EROMO, and CHRISTOPHER GOFF, the defendants, were employed by a mobile aggregator based in the United States (the "U.S. Mobile Aggregator").  WEDD was the Chief Executive Officer ("CEO"), EROMO was the Senior Vice President of Business Development, and GOFF was an Account Manager for the U.S. Mobile Aggregator.

13.   At all times relevant to this Indictment, MICHAEL PEARSE and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, were employed by a mobile aggregator based in Australia (the "Australian Mobile Aggregator").  PEARSE was the CEO and LIU was a Java Development Engineer for the Australian Mobile Aggregator.

14.   At all times relevant to this Indictment, YONG JASON LEE, the defendant, was a computer programmer employed by a digital content provider based in the United States that offered Premium SMS services to mobile phone customers (the "Content Provider").  LEE was the Chief Technology Officer for the Content Provider.

-6-

## The Scheme to Auto-Subscribe Consumers

15.   In or about 2010, a co-conspirator not named as a defendant herein, who was the CEO of the Content Provider ("CC-1"), decided to begin auto-subscribing mobile phone users to the Content Provider's Premium SMS services in order to boost the Content Provider's sagging revenues.

16.   To do this, CC-1 needed a way to make it appear that the consumers who were auto-subscribed had actually agreed to be billed for the Premium SMS service, in the event that a mobile carrier or one of the industry compliance groups conducted an audit of the short code subscriptions.   Accordingly, in or about the end of 2010, CC-1 approached MICHAEL PEARSE and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, and asked them to build a computer program that could spoof the required consumer authorizations – i.e., a program that could generate the text message correspondence that one would ordinarily see with genuine double opt-in verifications.   PEARSE and LIU agreed to build the program (the "Auto-Subscription Platform"), which was operational by in or about the middle of 2011.

17.   Before the Content Provider could begin auto-subscribing consumers, CC-1 needed a large volume of mobile phone numbers to run through the Auto-Subscription Platform. Accordingly, in or about July 2011, CC-1 approached CHRISTOPHER GOFF, the defendant, who was the Account Manager for the Content Provider

at the U.S. Mobile Aggregator.   By virtue of his position at the U.S. Mobile Aggregator, GOFF had access to millions of mobile phone numbers.   GOFF agreed to provide large batches of phone numbers to CC-1 in exchange for payment.   GOFF subsequently emailed an initial batch of mobile phone numbers to CC-1 in or about July 2011, and emailed additional batches of numbers to CC-1 on several occasions up through mid-2012.   In total, GOFF sent CC-1 hundreds of thousands of phone numbers for the purpose of auto-subscribing consumers.

18.   Throughout the summer of 2011, CC-1, MICHAEL PEARSE, and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, ran the phone numbers provided by CHRISTOPHER GOFF, the defendant, as well as others, through the Auto-Subscription Platform and billed the subscriptions through mobile aggregators, including the U.S. Mobile Aggregator.   In or about September 2011, executives at the U.S. Mobile Aggregator – including the CEO, DARCY WEDD, the defendant – noticed that the data for one of the Content Provider's short code campaigns indicated non-compliance and raised the issue with CC-1 and another co-conspirator not named as a defendant herein, who was the Director of Global Sales for the Content Provider ("CC-2").

19.   As a result, in or about October 2011, CC-1 met with DARCY WEDD, the defendant, in San Diego, California.   At that meeting, CC-1 told WEDD, in sum and substance, that CC-1 wanted to auto-subscribe consumers through the U.S. Mobile Aggregator, and

-8-

needed WEDD's help to do so.  CC-1 further told WEDD, in sum and substance, that CC-1 needed additional phone numbers and short codes to facilitate the auto-subscribing.  WEDD agreed to assist CC-1 with auto-subscribing in exchange for an up-front payment of approximately $100,000 and a percentage of the auto-subscription proceeds.  WEDD further told CC-1, in sum and substance, that another co-conspirator not named herein, who was the Vice President of Compliance and Consumer Protection for the U.S. Mobile Aggregator ("CC-3"), would provide phone numbers to CC-1 and that all payments needed to go through CC-3.  WEDD later received his portion of the payments from CC-1 via CC-3.

20.   Shortly after the meeting in San Diego, in or about October 2011, CC-1 sent CC-2 to meet with CC-3 at the U.S. Mobile Aggregator's headquarters in Los Angeles, California.  At that meeting, CC-2 gave CC-3 a portion of the $100,000 up-front payment in cash, and in return CC-3 gave CC-2 a thumb drive containing a large number of additional mobile phone numbers to be used to auto-subscribe consumers through the U.S. Mobile Aggregator.  CC-3 provided additional batches of phone numbers to CC-1 and CC-2 on several occasions up through mid-2012.

21.   CC-1 received the numbers from CC-2 and passed them to the Chief Technology Officer of the Content Provider, YONG JASON LEE, a/k/a "Jason Lee," the defendant.  It was LEE's responsibility,

among other things, to verify that the phone numbers were still valid and active, and to sort and filter the numbers to make it easier to run them through the Auto-Subscription Platform.  After LEE performed these functions, CC-1 sent the numbers to MICHAEL PEARSE, and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, to be run through the Auto-Subscription Platform.

22.   CC-1 also met with ERDOLO EROMO, the defendant, at the direction of DARCY WEDD, the defendant.   In order to successfully auto-subscribe consumers through the U.S. Mobile Aggregator, the Content Provider's short codes needed to be migrated to a different billing platform at the U.S. Mobile Aggregator.   WEDD indicated to CC-1 that CC-1 would need to arrange this with EROMO, who was the Senior Vice President of Business Development at the U.S. Mobile Aggregator.   Soon after the meeting with WEDD in or about October 2011, CC-1 met with EROMO to discuss the short code migration.   EROMO told CC-1, in sum and substance, that EROMO knew about the plan to auto-subscribe consumers and requested $10,000 in cash for each short code migration.   CC-1 agreed to EROMO's terms and thereafter sent, or caused to be sent, several cash payments to EROMO's residence through the mail.

**Efforts to Conceal the Auto-Subscription Scheme**

23.   In an effort to protect the revenue generated by the auto-subscription scheme, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER

GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and other co-conspirators not named as defendants herein, took steps to conceal the scheme from the mobile carriers and mobile industry compliance groups.   For example:

    a.   CC-3 helped CC-1, PEARSE, and LIU correct errors in the Auto-Subscription Platform that had raised red flags in the U.S Mobile Aggregator's short code monitoring system.   For example, PEARSE and LIU, among other things, modified the Auto-Subscription Platform to randomize the timing of the text messages that it generated – which were supposed to appear as if they were generated by actual consumers opting-in to the Premium SMS service – in a way that made them appear human-driven, not computer-driven.   The goal was to make the subscriptions appear natural in order to avoid short code audits entirely or to minimize their severity.

    b.   CC-1 and CC-2 also purchased from EROMO and CC-3 so-called "blacklists" or "ninja lists," which were lists of phone numbers that should not be auto-subscribed.   The numbers on these lists included phone numbers belonging to executives at the mobile carriers and people at the mobile industry compliance groups, who would likely initiate an audit if they noticed that they had been auto-subscribed to a Premium SMS service that they had not authorized.   CC-1 and CC-2 paid EROMO and CC-3 approximately $10,000

for each "blacklist"/"ninja list," which were updated approximately each month.  These payments were typically in cash and were often sent to EROMO and CC-3 through the mail.

       c.    CC-1 and CC-2 also paid EROMO to obtain additional short codes on an expedited basis, which CC-1, CC-2, and PEARSE registered with companies that they controlled, but that were not affiliated with the Content Provider.  This was done to spread out the auto-subscribing among different short codes and different corporate entities in order to reduce the possibility that the full scope of the scheme would be detected by mobile phone carriers, mobile compliance groups, and/or consumers.  It also ensured that if one short code were suspended or terminated, other short codes would remain operational to continue auto-subscribing consumers.

       d.    EROMO and CC-3 also offered to use their influence with employees at the mobile carriers who handled short code audits to mitigate any problems that arose.  For example, CC-3 had a contact at one of the major mobile phone carriers ("Mobile Carrier-1") whom CC-3 had paid in the past to receive favorable treatment ("Mobile Carrier-1 Employee").  CC-3 offered to use CC-3's influence with Mobile Carrier-1 Employee, in exchange for a fee of several thousand dollars, to remove suspensions or terminations of the Content Provider's short codes at Mobile Carrier-1.  Similarly, EROMO claimed to have a contact at a different major mobile phone

-12-

carrier ("Mobile Carrier-2"), whom he could approach about mitigating audits ("Mobile Carrier-2 Employee"), also in exchange for a fee of several thousand dollars.

e.   WEDD, CC-3, and another co-conspirator not named as a defendant herein ("CC-4") also provided false and misleading responses to audits requested by the mobile phone carriers and industry compliance groups in order to conceal their auto-subscription scheme.

24.   DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and other co-conspirators not named as defendants herein, also took steps to conceal their own involvement in the fraud.  For example:

a.   WEDD, EROMO, GOFF, and CC-3 used shell companies to receive payments for their assistance with the fraud scheme, and/or received their payments in cash.

b.   EROMO, GOFF, and CC-3 also did not use their work email addresses at the U.S. Mobile Aggregator to correspond with CC-1 and CC-2 about the auto-subscription scheme.  Instead, they used personal email address and/or email address associated with their shell companies.

## Proceeds of the Auto-Subscription Scheme

25.  The auto-subscription scheme continued to generate proceeds through in or about 2013.  In total, the scheme generated tens of millions of dollars in profits, which were apportioned among DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and other co-conspirators not named as defendants herein.  The proceeds came from unwitting consumers, including consumers who were defrauded in the Southern District of New York, who paid for Premium SMS services that they never authorized.

## Statutory Allegations

26.  From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and mail fraud, in violation of Title 18, United States Code, Section 1341, to wit, WEDD, EROMO, GOFF, PEARSE, LIU, and LEE participated in a scheme to defraud wireless cellular telephone customers by charging customers for Premium SMS services without the customers' knowledge or authorization.

-14-

27. It was a part and an object of the conspiracy that DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

28. It was a further part and an object of the conspiracy that DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause

-15-

to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom, such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Wire Fraud)

The Grand Jury further charges:

29.   The allegations set forth above in Paragraphs One through Twenty-Five are realleged and incorporated by reference as if set forth fully herein.

30.   From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be

-16-

transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WEDD, EROMO, GOFF, PEARSE, LIU, and LEE participated in a scheme to defraud wireless cellular telephone customers by charging customers for Premium SMS services without the customers' knowledge or authorization.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

31.   The allegations set forth above in Paragraphs One through Twenty-Five are realleged and incorporated by reference as if set forth fully herein.

32.   From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere DARCY WEDD, ERDOLO EROMO, and CHRISTOPHER GOFF, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), to wit, WEDD, EROMO, and GOFF facilitated the transfer of funds from certain bank accounts, which contained proceeds of the fraud scheme alleged in Count Two, to the

bank accounts of nominee companies controlled by WEDD, EROMO, GOFF, and other co-conspirators, and caused cash to be sent and received through the mail and via other co-conspirators, in order to conceal payments that WEDD, EROMO, and GOFF received for their respective roles in the fraud scheme alleged in Count Two.

33.   It was a part and an object of the conspiracy that DARCY WEDD, ERDOLO EROMO, and CHRISTOPHER GOFF, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i),

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

34.   As a result of committing the offenses alleged in Counts One and Two of this Indictment, DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants, shall forfeit

to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One and Two.

## FORFEITURE ALLEGATION AS TO COUNT THREE

35.   As a result of committing the offense alleged in Count THREE of this Indictment, DARCY WEDD, ERDOLO EROMO, and CHRISTOPHER GOFF, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the offense alleged in Count Three, or any property traceable to such property.

## Substitute Asset Provision

36.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of DARCY WEDD, ERDOLO EROMO, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," and YONG JASON LEE, a/k/a "Jason Lee," the defendants,

  a.   cannot be located upon the exercise of due diligence;

  b.   has been transferred or sold to, or deposited with, a third party;

  c.   has been placed beyond the jurisdiction of the court;

  d.   has been substantially diminished in value; or

e.    has been commingled with other property which cannot
      be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p), to seek forfeiture of any other property

of said defendants up to the value of the forfeitable property

described above.

    (Title 18, United States Code, Sections 981 and 982;
        Title 21, United States Code, Section 853;
        Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_Preet Bharara_
_____
PREET BHARARA
United States Attorney

-20-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

**DARCY WEDD,
ERDOLO EROMO,
CHRISTOPHER GOFF,
MICHAEL PEARSE,
YONGCHAO LIU,
a/k/a "Kevin Liu,"
YONG JASON LEE,
a/k/a "Jason Lee,"**

**Defendants.**

### SEALED INDICTMENT

15 Cr. _____

(18 U.S.C. §§ 1343, 1349,
1956(h), and 2.)

Preet Bharara
United States Attorney.

**A TRUE BILL**

Foreperson.

9/9/15 - Filed Sealed. Indictment
as Al/W is issued

J Maas
USMs