# SERCARZ & RIOPELLE, LLP
810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ[*]

ROBERT CALIENDO
GIULIANA E. GRAHAM

[*]ADMITTED IN NY & NJ

January 10, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    *Re:  U.S. v. Darcy Wedd, et. al., 15 CR 616 (KBF)*

Your Honor:

  We respectfully request that the Court reconsider its decision, made in the immediate aftermath of the verdict convicting the defendant, to remand him.

  For the reasons set forth herein, we respectfully submit that the Court's decision was based upon a description of the defendant's assets abroad that no longer was accurate. Moreover, since the defendant was remanded, his circumstances have changed in a way that further diminishes any risk of flight.

  While we are mindful of the burden imposed upon defendants by 18 U.S.C. § 3143, we submit that under the circumstances present here, the bail conditions described below will afford adequate reassurance that the defendant is no longer a flight risk.

**The Application For Remand**

  The Government sought to remand the defendant based upon three factors:

  First, the Government's initial Guidelines calculation yielded a presumptive sentencing range that would result in a substantial jail sentence. Second, in the Government's view, the defendant testified falsely at all three trials that led to his conviction. Third, and most importantly, the Government noted the defendant's "comparative ties overseas versus with the United States." (Tr3-2141).[1]

---

[1] Citations in the form (Tr3-  ) refer to the transcript of the bail proceeding at the end of the third trial.

The Government noted that the defendant's father owned a resort in Bali that the defendant helped fund and that the defendant's brother in law owns property in Australia. "According to his tax returns," the Government said, the defendant owns three properties in Australia, two in Perth and one in a town called Milsons Point. (Tr3-2145). The Government added, in reliance on a 2015 FBAR, that the defendant listed over $300,000 in funds in an account at ANZ Bank in Australia. (Tr3-2146).

Finally, the Government pointed out that within the last twelve months, the defendant applied for "Global Assist," described as a means of easing entry in the country. (Tr3-2145).[2]

**The Court's Decision**

The Court described the basis for its decision to remand the defendant, in pertinent part, as follows:

> Also, I am concerned, I am very concerned about the fact that this defendant has a family overseas, that he may continue to own property in Australia, that he may recently have owned property in Australia. Even if he did not, the presence of assets, including the $300,000 in a bank account in Australia, provides some possibility of reestablishing a life.
>
> Even without assets, however, the Court's decision would not be any different. This defendant, as argument was made at trial, has an ability to change countries, in the instance of coming over to the United States to pursue a job opportunity, but reestablishing a life in another country, including back in his home country, is not something with which this defendant is unfamiliar.
>
> In addition, as was argued during the trial, he has an appetite for risk.

(Tr3-2152-2153).

**The Basis For The Instant Application**

When the Government made its bail application, defense counsel was not in a position to rebut either the Government's statements regarding the defendant's finances, or the

---

[2] The defendant has a substantial difference of opinion with the Government regarding both the presumptive Guidelines calculation and whether it is appropriate to claim that the defendant committed perjury at all three trials – particularly given the Government's insistence upon seeking, and obtaining, a charge on "conscious avoidance" as an alternative basis for establishing the element of knowledge in this case. Because these factors were less important in the Court's determination, we will reserve our arguments on these issues for later on in the sentencing process.

Government's comments regarding the defendant's alleged efforts to obtain "Global Assist." However, we are now in a position to do so.

### A. The Defendant Has Substantial Ties To The United States

As the Court learned during the three trials of this case, Darcy Wedd volunteered to come to the United States in 2004, when Mobile Messenger was a fledgling company in Australia. Mr. Wedd was given the task of establishing Mobile Messenger's presence here in the United States. Mr. Wedd remained here as a permanent resident for thirteen years while becoming the Chief Operating Officer and, eventually, the Chief Executive Officer of Mobile Messenger. During this period, Mobile Messenger became a substantial technology company which, at its peak, had as many as 250 employees and was a leading aggregation company in the field of Premium Short Messaging Service.

It is clear, notwithstanding that the defendant was Australian by birth and had many family members in that country, that Mr. Wedd made an enormous emotional investment in growing this company here in the United States.

In 2011, Mr. Wedd changed his Visa status from an "E-Visa" to an "L-Visa," a prelude to obtaining a green card and eventual citizenship in the United States. These ties were strengthened when Mr. Wedd met and became involved with, Ashley Cole. It was Mr. Wedd's hope to become an American citizen, to marry Ashley and to raise a family with her here in the United States.

### B. The Government Provided An Outdated Version Of The Defendant's Financial Ties Abroad

The Government candidly acknowledged that its argument regarding the defendant's ties to foreign countries was the product of tax returns[3] and an FBAR filed in 2015. Accordingly, it is important for the Court to have updated financial information.

Annexed hereto are **Exhibits A-C**. These documents demonstrate that as of date of his conviction, the defendant no longer owned the three properties attributed to him in Australia. Moreover, **Exhibit D** demonstrates that the defendant's bank account at ANZ Bank in Australia was closed.

I am informed by Mr. Wedd that the proceeds from the sale of the Milsons Point and Bulwer Street properties were used for living expenses, monthly alimony payments, legal costs of his divorce, payments to prior counsel in connection with his representation in the Texas Attorney General and FTC lawsuits, renovations on his California property and an independent feature film investment of $180,000.

Mr. Wedd further informs me that in the summer of 2017, ANZ Bank unilaterally closed his account due to the charges against him. The bank used approximately $200,000 of the funds to pay off the mortgage on the Wellington Street property. ANZ Bank then sent Mr. Wedd a

---

[3] The Government did not indicate the relevant tax year for these returns.

check for the balance which was slightly under $20,000. Mr. Wedd deposited this sum into his United States bank account at Chase Bank.

The Wellington Street property was sold in approximately October 2017. The proceeds of the sale amounted to just over $300,000. Mr. Wedd used this sum of money to pay legal fees in connection with this case, a $15,000 security deposit for his apartment at 10 Jones Street and $60,000 in rental payments for that apartment. In addition, Mr. Wedd paid down some of his credit card debt.

These facts are important for several reasons: First, they demonstrate that the defendant does not have the kind of assets in Australia that would finance flight from the United States and residence abroad. These exhibits also demonstrate that as the defendant dealt with the financial burden of three trials, and the related civil litigation, he liquidated his assets abroad. This speaks volumes regarding the defendant's commitment both to defend the case and to remain in the United States regardless of the outcome.

### C. The Defendant Returned To The United States To Face The Charges

Annexed hereto as **Exhibit E** is a version of the correspondence from Wedd's previous attorneys that we referenced in Court during our application for Mr. Wedd's release pending sentence. During the summer of 2015, the defendant engaged in emergency travel to visit his mother who was undergoing an operation in Australia. While the defendant was abroad, his lawyers at Jones Day were informed that the defendant was a target of the investigation and were offered an opportunity to make a presentation on his behalf. As the letter reveals, it was while the defendant was still in Australia that he was notified by counsel of his position as a target of the investigation. Nonetheless, the defendant returned as scheduled. By the time he returned, both Mr. Miao and Mr. Pajaczkowski were already under arrest. (See Tr3-2147-49).

Moreover, as we argued in Court, the defendant maintained an impeccable record of meeting all of his obligations to the Court throughout the three trials. Indeed, prior to the third trial, the defendant was permitted to sell his condominium in Las Vegas, which had previously been posted as security for the bond.

### D. The Reference to "Global Assist"

Annexed hereto as **Exhibit F** is a photograph taken by Ashley Cole in the airport while the defendant and Ms. Cole were travelling to Las Vegas, Nevada, with the approval of the Court in October 2017. Both Mr. Wedd and Ms. Cole recall that while they were waiting on a security line, the line was closed and all passengers were told to get on another, equally long line. At this point, Mr. Wedd, in a moment of frustration, walked over to a nearby booth, and began filling out the forms for what he recalls as "TSA Pre-Check" and "Clear." In contrast to "Global Assist" which was designed to speed American travelers through security lines when they return to the country, "TSA Pre-Check and "Clear" are designed to permit passengers flying both domestically and internationally to move through security lines more rapidly. I am informed that Mr. Wedd never finished completing the application and never obtained the service. Moreover,

at no time has Mr. Wedd sought, or obtained, the return of his passport which was surrendered in connection with his previous bail conditions.

### E. Additional Changed Circumstances

The defendant was convicted and remanded on Friday, December 15, 2017. That afternoon, I was contacted by Darcy's mother in Australia and by Darcy's father, David Wedd, who called me from Indonesia. (The Court may recall that David Wedd was present in court during substantial portions of the defendant's first trial). Mr. Wedd called me from a hospital in Indonesia where he was being treated for an ailment that he did not disclose. He told me that he was hopeful of being released from the hospital the next day, and planned to come to the United States to visit Darcy.

On Sunday, December 17, 2017, I was informed that David Wedd had died suddenly. In the days that followed, I learned that Mr. Wedd had been suffering from an illness that affected his liver and pancreas. He had stubbornly refused to be hospitalized until he collapsed and had been in the hospital for approximately one week prior to our phone call.

I mention this development for two reasons: First, the death of my client's father means that one of the relationships that anchored my client to a foreign country has ended. Second, in light of these unfortunate developments, Mr. Wedd is most anxious to be in regular telephone contact with family members during this difficult period. This can only be accomplished if he is at home.

**Our Bail Proposal**

We request that the defendant be admitted to bail in accordance with the following terms and conditions:

1. A $1 million personal recognizance bond fully secured by properties to be posted by friends and family members.

2. The defendant will be subject to electronic monitoring and house arrest together with any other requirements that Pretrial Services should deem necessary in order to ensure his continued appearance.

**Conclusion**

I have been to the MCC to visit with Darcy on three occasions since the remand. During these visits, I have quizzed Darcy closely about how he would feel if he were released on bail knowing that when the date of sentence arrives, he will be incarcerated once again.

Mr. Wedd's arguments in favor of making this application are compelling: He is cognizant of the likelihood that he will receive a substantial jail sentence. He understands the emotional roller coaster that awaits him if he should be released. And, his desire to remain a part of his family during this difficult time is both appropriate and unselfish.

For all the reasons set forth herein, we respectfully request that the Court reconsider its decision to remand the defendant based upon this new information and grant the defendant his release on the conditions described above.

                                        Most respectfully,

                                        /s/

                                        Maurice H. Sercarz

cc:      All Parties (by ECF)