**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 18, 2018

**BY ECF**
The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   **United States v. Darcy Wedd, et al.,**
>          **S3 15 Cr. 616 (KBF)**

Dear Judge Forrest:

The Government writes in opposition to defendant Darcy Wedd's letter motion, dated January 10, 2018, seeking bail pending sentencing. As the Court found following the defendant's conviction at trial, the defendant has failed to meet his burden to prove by clear and convincing evidence that he does not pose a flight risk. While the defendant should be detained on that basis alone, he has also failed to meet his burden to prove that he poses no pecuniary danger to the community, which provides an independent basis for his detention.

### A.   **The Legal Standard For Bail Pending Sentencing**

After conviction, a defendant "no longer has a substantive constitutional right to bail pending sentencing" because he is "no longer entitled to the presumption of innocence." *United States* v. *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *1 (2d Cir. 2009) (citing *Williamson* v. *United States*, 184 F.2d 280, 281 (2d Cir. 1950)). Instead, a court "shall order that a person who has been found guilty of an offense and who is awaiting imposition . . . of sentence" be detained unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released." 18 U.S.C. § 3143(a)(1). As the Second Circuit has stated, through this standard, "Congress has itself weighted the procedural balance" of whether to detain a convicted defendant prior to the imposition of sentence "quite decidedly in favor of the government." *United States* v. *Abuhamra*, 389 F.3d 309, 320 (2d Cir. 2004).

With respect to the risk of flight, the Second Circuit has found that the length of a potential sentence may provide a defendant with an incentive to flee. *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *1. The length of the potential sentence "naturally bears upon and increases the risk of flight" and, as such, is a permissible consideration in assessing the risk of flight when determining whether to grant a convicted defendant bail pending sentencing. *Id.*

A defendant's financial means can increase the defendant's "ability" to flee and is also

properly considered in the bail pending sentencing inquiry. *Id.* Even where a defendant has argued that "all of his assets are accounted for and are inaccessible to him," a court need not treat the defendant's financial representations as reliable, especially where the defendant has ties abroad and had a "long period of time to secret substantial resources outside the country." *Id.*

This court has also considered as factors that heighten a defendant's risk of flight: (1) whether the defendant is a non-United States citizen; (2) whether the defendant has family inside or outside of the United States; (3) whether the defendant continues to have a livelihood in the United States; (4) whether the crimes for which the defendant was convicted involved dishonesty; and (5) whether the defendant may be deported upon the completion of his sentence of conviction. *See, e.g., United States* v. *Lauersen*, No. S2 98 CR 1134 (WHP), 2004 WL 1713816, at *3 (S.D.N.Y. July 26, 2004).

With respect to the danger of the defendant to the community, the Second Circuit has held that, at least in some financial crimes cases, danger may "encompass pecuniary or economic harm." *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *2 (finding that the defendant had failed to prove by clear and convincing evidence that he did not pose a danger to the pecuniary safety of any other person or the community if released) (internal alterations omitted); *see also United States* v. *Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992).

## B. Darcy Wedd Should Be Detained Pending Sentencing

### 1. *The Defendant Is a Flight Risk*

Here, Wedd has not offered clear and convincing evidence to overturn the Court's determination that he posed a "significant risk of flight." (Tr. 2153:23-24). As the Government noted after the defendant was convicted, there are three primary reasons that the defendant poses a flight risk: (1) he faces a substantial prison sentence of at least two and up to 124 years' imprisonment; (2) he has perjured himself during his testimony in three trials; and (3) he has significant overseas ties. (Tr. 2141:15-20). In the defendant's submission, he made no serious effort to challenge either the fact that he faces a serious prison sentence or that his testimony was materially false. (Def. Br. at 2 n.2). Yet, either or both would be enough to detain the defendant. Instead, the defendant challenges only a few discrete facts that speak to the significance of his overseas ties, such as his liquidation of some of his assets and his application for airline travel programs.

First, with respect to the sentence that the defendant faces, a preliminary Guidelines calculation suggests that the defendant's Guidelines Range will be "well over ten years" and perhaps as much as life imprisonment. (Tr. 2144:12-16; 2152:12-16). He also faces a mandatory minimum two to four years in prison and a combined maximum sentence on his eight counts of conviction of 124 years' imprisonment. (Tr. 2144:19-21). As the Second Circuit has noted, such a lengthy potential sentence provides the defendant with an incentive to flee and "naturally bears upon and increases the risk of flight." *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *1 (noting that the defendant was facing a potential sentence of 150 years).

Second, the defendant's decision to testify falsely under oath three times shows a "lack of respect for the justice system" and "for the Court" and raises the "very serious concern that, regardless of the conditions that the Court places on the defendant," he is likely to flee. (Tr. 2146:16-2147:3; 2153:23-2154:2). Moreover, the defendant's crime suggests that he is willing to lie and break the rules to achieve his goals. For years, he and his co-conspirators lied to consumers, regulators, phone companies, and others to carry on their auto-subscribing scheme. What's more, the core business of Mobile Messenger seemed to involve more of an effort to avoid getting caught than to make the business compliant with industry guidelines and beneficial to consumers. As the CEO of Mobile Messenger, the defendant became skilled at deception. Because that "skill set" will make it easier for the defendant to flee, it should be considered by the Court. *See Lauersen*, 2004 WL 1713816, at *3 (noting a conviction for a crime involving dishonesty as a factor in a flight risk analysis).

Third, with respect to the defendant's overseas ties, the Court noted its concern "about the fact that this defendant has a family overseas, that he may continue to own property in Australia, that he may have recently owned property in Australia" and that he has other assets that may provide "some possibility of reestablishing a life" in Australia or elsewhere. (Tr. 2152:22-2153:2). The Court also noted that, even if the defendant did not have "assets," the defendant would still have been detained, pointing to the defendant's argument at trial that he "has an ability to change countries" to pursue opportunities and that he "has an appetite for risk." (Tr. 2153:3-11). The core facts upon which the Court based its detention decision remain unchanged, and the Court should not alter its decision.

The defendant is, and has for a long period of time been, a man of means. He was well compensated for his on-the-books work at Mobile Messenger, and he received massive amounts of money from auto-subscribing and from the related content provider scheme, much of which the Government has been unable to trace. While the defendant may have liquidated some of his assets to pay expenses as he outlined in his letter, the Court should not credit the defendant's self-serving suggestion that he no longer has the means to flee because he has certainly had a "long period of time" since he stopped profiting from autosubscribing in 2013 to secret substantial resources outside the country." *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *1. Moreover, the defendant's family members may be able to provide additional resources that he could use to evade the Court's jurisdiction. Among the defendant's family members is at least one of sufficient financial means to own property in Australia. While the defendant's father has passed away, the defendant or his family members presumably stand to inherit his late father's resort in Bali, which the defendant helped to fund. (Tr. 2145:5-2146:15). The defendant's means add to his risk of flight, even crediting the specific liquidation transactions he highlights in his letter.

The defendant is also a non-citizen of the United States, as he concedes in his letter, and is likely to be deported upon completion of his sentence, both of which suggest ties to another country and an incentive to flee because removal from the United States is inevitable. The defendant's career in the United States in the premium short messaging industry is also over, both as a result of the collapse of that industry and as a result of this case. The trial testimony established that his long-time career at Mobile Messenger was the reason he came to and remained in the United States, so the elimination of that increases his risk of flight. *See*

*Lauersen*, 2004 WL 1713816, at *3 (noting citizenship status, risk of deportation, and job status as factors going to flight risk).

The defendant is also a practiced traveler.  By his own admission, the defendant began the process of applying for "TSA Pre-Check" and "Clear," which are designed to move frequent travelers through security lines more rapidly, in October 2017 while this case was pending.  (Def. Br. at 4).  The trial testimony also revealed that the defendant traveled frequently during the course of the scheme – on golf trips, to the Sundance Film Festival, to conferences, to meetings in Boston with Tatto, and elsewhere.[1]  The defendant's travel profile adds to his risk of flight, because he is facile with the systems and processes needed to travel.

The defendant also notes that he returned to the United States from Australia while he knew he was under investigation, self-surrendered when he was charged, and came to court to stand trial three times.  (Tr. 2147:14-2148:5; 2149:5-10).  But, being investigated and going to trial are very different circumstances than the ones that the defendant finds himself in now.  The defendant may have previously believed that he could "beat" the charges against him, which belief was likely strengthened by the two mistrials in this case.  (Tr. 2153:12-22 ("[T]here is a certain sense that this time he might have succeeded in beating the charge, and that, therefore, the attendance is sort of a risk/reward analysis, so I don't give it the same kind of weight that I otherwise might.")).  Now, the defendant faces a mandatory minimum sentence of two years' imprisonment, knows that he is likely to be sentenced to more than the 60-month sentence imposed on his less-culpable co-defendant, Fraser Thompson, and faces a maximum sentence of 124 years' imprisonment with a Guidelines range of as much as life imprisonment.  The defendant's previous attendance when the stakes were lower simply does not guarantee his attendance now when he is guaranteed to face a term of imprisonment, especially considering that the defendant has never before been imprisoned on any charge.

The defendant cannot establish by clear and convincing evidence that he does not pose a risk of flight, and he should be deposed on that basis alone.

2.  *The Defendant Poses a Financial Danger to the Community*

Wedd has also failed to address whether he poses a danger to the pecuniary safety of the community based on his long-term involvement in consumer fraud.  As the Second Circuit has

---

[1] On August 9, 2017, Special Agent Quoc Tuan Nguyen's supervisor received an email from the U.S. Customs and Border Protection's Assistant Director of its Trusted Traveler Vetting Center, indicating that the defendant had made an application to the Trusted Traveler Vetting Center. Since that time, the Government has confirmed that the defendant has not *completed* the process of enrollment for Global Entry, which is run by the Trusted Traveler Vetting Center, or for the separate TSA Pre-Check or CLEAR programs.  Based upon conversations with various employees of CBP, TSA, and the private company that operates CLEAR, however, records of applications to those programs are not regularly maintained.  As such, the Government cannot answer with certainty whether the defendant applied for Global Entry or another travel-related program.  Nonetheless, the defendant admits having initiated at least one such application during the pendency of his case and while his travel was restricted.

found, in certain financial crimes cases, danger to the community's pecuniary interests is properly considered in a detention inquiry. *Madoff*, 316 F. App'x 58, 2009 WL 728379, at *2. Here, the defendant and his co-conspirators engaged in a massive consumer fraud designed to steal from ordinary Americans $10 at a time. The defendant also operated for decades in an industry that the trial testimony revealed to be manipulative and deceptive at best. The defendant's indoctrination into that world and his consequent ability to lie and steal seemingly without remorse make him a danger to the community's pecuniary interests. The defendant has made no effort to carry his burden with respect to this prong of the detention inquiry.[2]

3. *The Defendant's Proposed Bail Package is Insufficient*

In his submission, the defendant proposes that he be released on home detention and a significant bond to be fully secured by his friends' properties. (Def. Br. at 5-6). As the Government noted post-conviction, home detention is not foolproof, and defendants have evaded it to escape the jurisdiction. (Tr. 2146:24-2174:3). With respect to the bond that the defendant proposes to secure with his friends' properties, the Government notes that it was the defendants' closest friends with whom he chose to autosubscribe. When he was in a position as the CEO from which he could have prevented autosubscribing and protected his friends from criminal liability, the defendant instead encouraged them and, in fact, joined in. And with respect to one of those close friends, Michael Paj, the defendant suggested that Paj go to jail in the defendant's stead in exchange for a payoff of $1 million. The defendant's friendships, no matter the closeness, have not stopped him from engaging in crimes that could jeopardize those friends' liberty and other interests. The posting of the defendant's friends' properties is simply insufficient to secure his return to face his sentence.

The Court should deny the defendant's request for bail and should continue the defendant's detention.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:      /s/ Jennifer L. Beidel
Sarah E. Paul/Richard A. Cooper/
Jennifer L. Beidel
Assistant United States Attorneys
(212) 637-2326/1027/2212

cc:      Maurice Sercarz, Esq. (by ECF)

---

[2] While the Government did not rely on this prong post-conviction, the burden to satisfy the detention standard was then and remains on the defendant.