I42AWEDSps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                        15-cr-616 (KBF)

DARCY WEDD,

            Defendant.

------------------------------x

                           New York, N.Y.
                           April 2, 2018
                           1:05 p.m.

Before:

               HON. KATHERINE B. FORREST

                          District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
BY:  SARAH E. PAUL, ESQ.
     RICHARD A. COOPER, ESQ.
     JENNIFER BEIDEL, ESQ.
     Assistant United States Attorneys

SERCARZ & RIOPELLE, L.L.P.
     Attorneys for Defendant
BY:  MAURICE H. SERCARZ, ESQ.
     ROBERT CALIENDO, ESQ.
     -and-
MARC FERNICH, ESQ.
     Attorney for Defendant

1              (In open court)

2              THE CLERK:  In the matter United States of America v.

3     Darcy Wedd, 15-cr-616.

4              Counsel, please state your names for the record.

5              MS. PAUL:  Good afternoon, your Honor.  Sarah Paul,

6     Rich Cooper, and Jennifer Beidel for the government.

7              THE COURT:  Good afternoon, folks.

8              MR. SERCARZ:  For the defendant Wedd, Maurice Sercarz,

9     Robert Caliendo, and, your Honor, Marc Fernich is in the

10    courtroom.  He will be representing Mr. Wedd in any post-

11    sentencing matters.  Is it all right if he comes up to the

12    front table and joins us?

13             THE COURT:  Absolutely.

14             MR. FERNICH:  Thank you, Judge.

15             THE COURT:  Of course.

16             All right.  The Court notes that Mr. Wedd is here and

17    present.  Good afternoon.

18             All right, folks.  You can all be seated.

19             The Court also notes that there are several dozen

20    people here in the audience, and I assume that a number of them

21    are here for Mr. Wedd, and while I recognize some folks from

22    the U.S. Attorney's Office, I think the majority of people are

23    here for Mr. Wedd.

24             So let's go ahead and get ourselves started.  I

25    typically start the sentencing proceedings by stating for the

1    record the counts of conviction and then also the materials

2    that I have received as part of this proceeding, to make sure

3    that we have a common universe.  And then after that we'll go

4    on to the PSR, then to the guidelines, and after that we'll

5    have statements from counsel and then from Mr. Wedd if he would

6    like to address the Court.

7            So the counts of conviction fall under really two

8    buckets of counts.  There's Counts One through Four, which

9    relate to the Tatto scheme, and then five through eight relate

10   to Zhenya.  The first count is a conviction of conspiracy to

11   commit wire fraud.  The second is wire fraud.  The third is

12   aggravated identity theft.  The fourth is conspiracy to commit

13   money laundering.  That's all with respect to the Tatto scheme.

14   Then for the Zhenya scheme there is conspiracy to commit wire

15   fraud, wire fraud, aggravated identity theft, and conspiracy to

16   commit money laundering.  So those are the counts of

17   conviction.

18           I have received several submissions from the defense:

19   a sentencing submission dated March 19, 2018, attached to which

20   are a number of letters.  I have received a total, between that

21   submission, a submission on March 29th, a submission today, and

22   then two letters that came in on their own, a total of 57

23   months for Mr. Wedd.  And I've also received, as an attachment

24   to the March 19th submission from the defense, a submission

25   from a sentencing specialist.

1    I've also received a sentencing submission from the

2  government dated March 26, 2018 and a copy of a revised

3  presentence investigation report dated March 9, 2018.

4    So those are the materials that I have received.  Are

5  there things that you folks think I should have that I have not

6  mentioned?  I should also say, just so that it's clear, I of

7  course presided over the trial, as you folks know, over three

8  trials, and so I'm very familiar with the trial record in this

9  matter.  But I'm taking that as an assumed body of material.

10    Anything from the government that I should have that I

11  haven't mentioned?

12    MR. COOPER:  No, your Honor.

13    THE COURT:  All right.  Mr. Sercarz.

14    MR. SERCARZ:  No, your Honor.  You covered it.  I

15  thought I noticed a quizzical look from my friend, Mr. Cooper.

16  The letter from the sentencing specialist was also an exhibit

17  to our thick submission.

18    THE COURT:  Yes.  It's Exhibit G as in George.  It's

19  Joel Sickler.  And I just separate it because there are letters

20  otherwise that are broken into a number of categories, and then

21  there's that piece.

22    All right.  The PSR, let's go on to, then, the PSR.

23  Mr. Sercarz, have you had an opportunity to review the PSR with

24  your client?

25    MR. SERCARZ:  Yes, your Honor.

1          THE COURT:  And I note that there were a number of

2     modifications to the PSR that appear to have occurred during

3     the back-and-forth of the drafting process, but are there any

4     additional modifications that you believe should be made to the

5     PSR, or objections that you have to the factual statements in

6     the PSR?

7          MR. SERCARZ:  None beyond what is contained in my

8     submission, your Honor.

9          THE COURT:  All right.  As I understand your

10    submission in terms of the issues that are raised, they're

11    largely with regard to the guidelines calculation, which I do

12    not adopt as a matter of course.  I would only adopt the

13    factual statements in the PSR.  Are there any factual errors

14    that you believe have been unaddressed in the PSR?

15         MR. SERCARZ:  No, your Honor.

16         THE COURT:  OK.  Mr. Wedd, it is my practice always to

17    ask the defendant himself if you know of any factual errors in

18    the PSR.

19         THE DEFENDANT:  No, your Honor.

20         THE COURT:  All right.  And Mr. Sercarz, you have

21    reviewed the PSR with your client?

22         MR. SERCARZ:  I have, your Honor.

23         THE COURT:  All right.  Does the government have any

24    factual modification to or objections to the PSR?

25         MR. COOPER:  No, your Honor.

I42AWEDSps

1    THE COURT:  The Court does adopt the factual statement

2    in the PSR.  The PSR will be made part of the record in this

3    matter and filed under seal.  If an appeal is taken, then

4    counsel on any appeal may have access to the PSR without any

5    need for further application to the Court.

6    Let's then go on to the next sort of series of points,

7    which have to do with the guidelines calculation.  As you folks

8    know, the Court is required to correctly calculate the

9    guidelines for every defendant, and that is true irrespective

10   of whether the Court is going to follow the guidelines.  The

11   guidelines are not to be taken as reasonable; they are to be a

12   guide for the Court.  Here, there are a number of arguments

13   that have been presented, both by the defense against what

14   probation has calculated as the guidelines and by the

15   government in response to the defense arguments.  So what I

16   would like to do right now is to go through the guidelines, to

17   tell you how I propose that they be calculated, without

18   reaching a final resolution on that calculation until I've

19   given you folks an opportunity to address the Court again.  I

20   don't need you to restate a point that you've made in your

21   submission, though if you want to -- for the guidelines,

22   although if you want to reiterate them, I'm not going to stop

23   anyone.  But I want to make sure that you understand I'm not

24   thinking anybody has waived their arguments on the guidelines

25   by not reiterating them right now.

I42AWEDSps

1          So, as you folks know, because there are multiple

2     counts of conviction, the Court does undertake a grouping

3     analysis, and that ultimately leads us to 2B1.1(a)(1).  We are

4     at, with an offense level of 7 -- I don't think there's any

5     dispute about that because the counts of conviction that lead

6     us to 2B1.1 are counts which carry a 20-year maximum sentence.

7     So that leads us to an offense level, base offense level, of 7.

8          The first set of issues that are disputed between the

9     parties here have to do with the loss amount.  As you folks

10    know and briefed, under the guidelines, the loss amount can be

11    based upon a couple of things.  One is actual loss -- I should

12    say reasonably foreseeable actual loss.  The other is intended

13    loss.  So I've reviewed the guidelines.  I'm not going to

14    recite all of the guidelines language right now.  But I've

15    reviewed the guidelines and the application notes.  I've also

16    reviewed the parties' arguments on the guidelines.

17         It does appear to me that the loss amount of greater

18    than 65 million but under 150 million, that that range does not

19    include the content providers.  Now, let me tell you how I

20    arrive at that.  It is based both upon testimony, but,

21    importantly, it's based upon the extrapolation of what Zhenya

22    would have received or what Miao would have received, what the

23    amount of the schemes would have been when you look only at the

24    percentage of the amount that was received by the defendant and

25    his co-conspirators.  In other words, when you look at GX 1401,

1  that gives you, I think, a misleading view.  First of all, GX

2  1401 includes both content provider money, which is not

3  includable, and everyone agrees is not includable and should

4  not be included, but also, it only includes those amounts paid

5  to the co-conspirators, who were working for Mobile Messenger.

6  It doesn't include all of the amounts that were being paid to

7  others.  And so you have to sort of extrapolate up, if you

8  will, from that document.  So that document only gives us a

9  piece of the picture, and you need to go to other sources.

10        The other sources for that are the testimony of Miao,

11  the testimony of Pajaczkowski, and the overall testimony

12  relating to the Zhenya scheme and to the Miao scheme.  The Miao

13  scheme had an overall amount of $112 million.  And the Tatto

14  scheme the Zhenya scheme had an overall loss amount of $41

15  million.  So it's $153 million all together.  That's based upon

16  the gross amount that was attributable to those.

17        The first point I want to make is, I believe that the

18  $153 million is well grounded and supportable as noncontent

19  provider receipts.  I want to ask the defense, who had asserted

20  in their papers that it included content providers, whether or

21  not -- and you're not waiving your other arguments as to how it

22  may overstate Mr. Wedd's culpability or anything else, but just

23  in terms of the amounts attributable to the two schemes,

24  whether or not you've got a basis to say that it really only

25  can relate to the content provider schemes, because the way I

1    look at it, I don't think it does.

2            Mr. Sercarz.

3            MR. SERCARZ:  Your Honor, I think you're right to the

4    degree that you can get above $65 million without including any

5    of the content provider money.  I don't intend to belabor the

6    issues very much at all beyond the lengthy submission that I

7    made dealing with these subjects, but I want to point out two

8    things.  Leave aside the content provider money.  With regard

9    to the Tatto scheme, I think the Court still has a decision to

10   make about whether or not to include within the scope of the

11   conspiracy money that Tatto made auto-subscribing on the

12   aggregation platforms of aggregators other than Mobile

13   Messenger, because I think that accounts for a lot of the money

14   in Government's Exhibit 1401.  It accounts for the wide range

15   that the government has provided.

16           With regard to the Tatto scheme, there was also an

17   issue as to whether or not it was reasonably foreseeable to my

18   client and a part of the conspiracy that Tatto, or Mr. Miao in

19   particular, would take it upon himself to auto-subscribe all of

20   the phone numbers that he was given.  I dealt with this in my

21   submission, but the Court is aware of Mr. Miao's version of the

22   conversation that took place in San Diego and

23   Mr. Pajaczkowski's playbook and the instructions that called

24   upon Mr. Miao to auto-subscribe only one third or thereabouts,

25   30 percent to be more precise, of the customers whose phone

I42AWEDSps

1    numbers he had been given for that purpose.

2         With regard to the Zhenya conspiracy, I think there is

3    an open question, even if you adopt the government's version of

4    what took place and the money paid to the four Mobile Messenger

5    executives was the proceeds of auto-subscribing to be split

6    among the four executives rather than revenue sharing in

7    exchange for the preprovision short codes, even if you accept

8    that, it's still an open question, I respectfully submit,

9    whether all of the money that Zhenya paid to MBKSE Ventures,

10   which is the beginning of the long, circuitous trail by which

11   money reached the four Mobile Messenger executives, as to

12   whether all of that money was indeed the proceeds of

13   auto-subscribing.

14        And I say that because if it's 65 million or less, you

15   come down two points.  And I say it while I'm on my feet, fully

16   mindful that I am hoping at the end of this proceeding to

17   receive some solace from *United States v. Crosby*, which says in

18   effect that if a defendant can be found at one of two adjacent

19   guidelines calculations and the court sees fit at the end of

20   the day to impose a nonguidelines sentence, that the court does

21   not, if I understand the case correctly, even have to make a

22   choice.

23        THE COURT:  Well, let's just cut to the chase in one

24   respect, which is that the guidelines calculated in a variety

25   of different ways would lead to an offense level of 43.  I

think that there is no debate that Mr. Wedd is in a criminal

history category of I. Therefore his guidelines are light.

There's not a chance that I would impose a life sentence. That

is not on the table. And so we are talking about a

nonguidelines sentence right out of the box.

And so I think people -- I do not see the government

asking for a guideline sentence and I would not impose a

guideline sentence in this case.

So we are talking about a variance. We'll deal with a

departure request in a moment, but let's just get that off the

table. All right.

So let's just go to the issues that Mr. Sercarz has

raised. I can deal, I think, pretty easily with the Miao and

the Digi-CF pieces. But I'm going to ask the government to

respond both to those, but also to the part of the conspiracy

for $112 million that deals with other aggregators, so I'll

come back to that. But in terms of whether or not it was

reasonably foreseeable that Miao would auto-subscribe all of

the numbers, I believe it was reasonably foreseeable, for

several different reasons: one, it doesn't appear that Mr. Wedd

got himself into the weeds of exactly how Mr. Pajaczkowski

would be in fact assisting Miao with auto-subscribing. There

was a general sense that he would assist him in a manner that

ought to lead to less risk of detection. But how exactly that

would be done, whether that would result in a reduced

1   percentage or any particular percentage auto-subscribing is not

2   something as to which there was testimony.

3          It was, however, on the other hand, quite well known

4   that, by this point in time, when the Tatto scheme was agreed

5   to, that Miao was a disreputable character, an individual who

6   had engaged in auto-subscribing, and who didn't really seem to

7   have any particular moral compass.  So it was well and truly

8   something that could have been reasonably predicted that Miao

9   would, through a venal impulse, try to take as much as he could

10  possibly take from any auto-subscribing opportunity made

11  available to him.  So I don't find persuasive and did not find

12  persuasive in the submission the argument that the Miao scheme,

13  the Tatto scheme, was anticipated to be only 30 percent of its

14  denominator, versus a hundred percent, based upon a sense of

15  trying to only auto-subscribe a portion of the phone numbers.

16         As to Zhenya, for that, the argument, as I understand

17  it, is really that the Digi-CF, that it was not foreseeable,

18  really, that they were going to be auto-subscribing and that

19  there was not an auto-subscribing conspiracy, that they were

20  somehow -- there was a revenue share in place for the, as

21  they've been described, pre-provisioned short codes.  I

22  actually don't think that that is supported, well supported by

23  the evidence.  I understand that it's the argument that the

24  defense had made and made it to the jury that Digi and CF were

25  really -- that the moneys flowing in through those companies

1   could have been anticipated to simply be just short code

2   revenue shares.  I don't find that persuasive at all.  I think

3   that there was ample evidence that I found reliable and

4   persuasive that Digi and CF were set up for the purpose of

5   auto-subscribing, that they were known to be directed towards

6   that endeavor, and that in fact they did auto-subscribe, and

7   that the moneys were understood to be the proceeds of

8   auto-subscribing.  So for that argument I also put that to the

9   side.

10         I would, however, like to hear whatever additional

11   points the government would like to make on either of those, as

12   well as the argument that some portion of the $112 million

13   relates to proceeds from Mr. Miao, or Tatto, for other

14   aggregators, and whether or not other aggregation proceeds was

15   related conduct and/or reasonably foreseeable.

16         Mr. Cooper.

17         MR. COOPER:  Yes, your Honor.  So I'll start there.

18   First, the number does include proceeds that Miao obtained from

19   auto-subscribing on other mobile aggregators.  It's the upper

20   left-hand corner of Government Exhibit 1401, MBlox and

21   OpenMarket in addition to Mobile Messenger.

22         There are three reasons why the inclusion of that is

23   appropriate here.  First, from a reasonable-foreseeability

24   standpoint, at the time that Mr. Wedd joined the conspiracy in

25   October 2011, Mr. Wedd knew that Miao had been auto-subscribing

1    on other mobile aggregators in addition to Mobile Messenger.

2    There was that string of e-mails, the Court may recall,

3    Government Exhibits 185, 186, and 187, at the last trial, where

4    Mobile Messenger employees were discussing having been

5    auto-subscribed -- I believe this is in the August, September

6    2011 time frame -- having been auto-subscribed by Miao-owned

7    companies on other mobile aggregators.

8            There is also sufficient evidence to find by a

9    preponderance that Mr. Wedd himself had been auto-subscribed on

10   a Miao short code on a different mobile aggregator.

11           So from the perspective of, at the time Mr. Wedd

12   joined the conspiracy, whether he had a basis to understand

13   that Miao was already doing similar things with other mobile

14   aggregators, there certainly was.  And the Court sees that sort

15   of thing all the time.  The most common example, in my mind, is

16   a narcotics conspiracy, where if a member joins knowing that

17   co-conspirators have already been selling on other blocks in

18   other areas and has a good sense for the scope of that, they

19   are responsible for what happened before.  But the case here is

20   much stronger than that, because the loss amounts attributable

21   to Mr. Miao auto-subscribing on other aggregators are from time

22   periods after Mr. Wedd joined.  So if there's a question as to

23   whether it was foreseeable to him that Miao was doing this and

24   others, it certainly was.

25           THE COURT:  Isn't there an argument, though, just sort

1    of an easier road, which is, you can take those amounts out and

2    still be above the threshold for the 2B1.1(b)(1)(M) guideline

3    provision which provides for the increase of over 65 million.

4              MR. COOPER:  Yes.  Those would be the third point.

5    But even subtracting out those others, the CF and Digi consumer

6    loss, plus the Mobile Messenger-related Miao consumer loss gets

7    you over the 65 million.

8              The other point to make on this particular issue is

9    that Mr. Wedd got paid a percentage of all Miao

10   auto-subscribing regardless of whether it occurred on Mobile

11   Messenger, MBlox, or OpenMarket.  Mr. Pajaczkowski testified to

12   that, and that's the transcript at page 265.

13             So in terms of his involvement being auto-subscribing

14   on the other aggregators, it was well proven at trial.

15             The only other point on this topic, in addition to the

16   fundamental point that, even subtracting out OpenMarket and

17   MBlox, you still get above the guidelines hump of $65 million

18   dollars, is that in October 2011 when Miao met with Mr. Wedd,

19   Miao disclosed to Mr. Wedd that he had been doing this, in

20   other words, he had been auto-subscribing on MBlox.

21             THE COURT:  I am persuaded that the record supports by

22   a preponderance of the evidence a loss amount that is greater

23   than $65 million but less than $150 million.  Where it falls

24   within that range I need not determine, because I find that it

25   reaches the point where it triggers the 24-level enhancement --

1    or increase in the offense level, I should say, not

2    enhancement -- but does not go over the $150 million, by a

3    preponderance of the evidence.  And I base that upon the

4    Court's view that, first of all, it's not necessary that I

5    include the OpenMarket or MBlox amount in order to even get

6    there.  But second of all, even if I did, for essentially the

7    reasons that Mr. Cooper has stated, it's supported by the

8    record.  So I will find by a preponderance of the evidence that

9    loss amount.

10           I should also note a few additional points about the

11    factual underpinnings for this, which is that I do believe that

12    the record supports -- I should say all my findings today that

13    are factual in nature are based upon a preponderance of the

14    evidence -- that Mr. Wedd understood what the auto-subscribing

15    business -- the kind of breadth that Miao was capable of and

16    Zhenya was capable of given the breadth of the business that

17    Mobile Messenger was in -- in other words, there were just

18    millions of phone numbers that could be used -- and therefore

19    that there was a reasonably foreseeable huge scope for this.

20           I also believe that it's well supported by the record

21    that Mr. Wedd understood exactly what Paj could do for Miao and

22    how Paj and others could assist Zhenya both in setting up a

23    scheme and then proceeding with it, and that the numbers --

24    also that Mr. Wedd was aware of the amount of money that was

25    coming in at various points in time to his companies, and it

1    was reasonably easy to extrapolate from that an increase in the

2    overall amount or what the overall amount would have been that

3    would have been given to the other co-conspirators, including

4    the large amounts given to Zhenya and to Miao.

5           One point that I want to address very specifically is

6    whether or not there should be any reduction or alteration in

7    the loss amount due to amounts returned to consumers.  That was

8    a point that was alluded to in the defense submission.  I do

9    not find that there is any basis for such reductions.  The

10   basis for such reduction that was alluded to was some sort of

11   almost like an offsetting principle.  But it is quite clear

12   from the way in which a loss amount is calculated that

13   reductions are only available when it's by the defendant or

14   others jointly working with him before the fraud is detected,

15   and that the point of the deductions, or reduction, is really

16   if somebody has learned that -- or comes to view their behavior

17   as wrongful and is able to start making it right at a point

18   prior to when law enforcement or somebody else decides that

19   they've been caught, that there is some benefit that should be

20   given for that.

21          Here, however, there is no evidence that the -- in any

22   significant way, that the co-conspirators, or in particular

23   Mr. Wedd, themselves are responsible for the amounts returned

24   to consumers.  That has been done by another victim and series

25   of victims here of the fraud, which were some of the telephone

1  companies, have actually refunded some of the money.  That is

2  not the kind of reduction or offset that was anticipated by the

3  guidelines.  And so I don't find that it's applicable here.

4  Therefore the loss amount I do find is at the range as I've

5  described it, which has a base, so we now would increase the

6  offense level by 24 levels.  So it's 7 at the base, plus 24.

7         Let's go on to the next piece, which is the ten or

8  more victims.  I didn't see any argument from the defense that

9  that is not applicable.  I think it's reasonably applicable

10 based upon paragraph 79 of the PSR, along with testimony and

11 exhibits that indicate that there were thousands of individuals

12 who were victims.  So that would add two additional offense

13 levels.

14        Is there any additional argument anybody wants to make

15 about that?

16        MR. SERCARZ:  No.

17        THE COURT:  OK.  Then sophisticated means.  That's

18 under 2B1.1(b)(10)(C).  Again, I think there really is not an

19 argument that's been made here that does not apply.  The use of

20 shell companies and the layers of shell companies is certainly

21 in and of itself sufficient to support that determination.

22 Also the process, for which there is a great deal of evidence,

23 of spoofing the double opt-in, the entire technological process

24 that was put in place here is sufficient to support the

25 inclusion of the sophisticated means enhancement.  And so I

1    would refer to paragraphs 39 to 41 of the PSR, 43, and 44, 49,

2    51 to 53, and 56 to 59, and also to application note 2B1.1,

3    application note 9.  And so I think that there's ample basis to

4    include sophisticated means.

5              Is there any additional argument anybody would like to

6    make about that?

7              Hearing nothing, let's go on to the next one, which is

8    that the defendant was convicted back under Section 1956.  That

9    is under 2S1.1(b)(2)(B), the basis for an inclusion of two

10   additional levels.  Any argument about that?

11             MR. SERCARZ:  No.

12             THE COURT:  OK.  The next one, which is contested, is

13   for the role adjustment.  And that's under 3B1.1(a).  The

14   question is whether or not Wedd was an organizer or leader of a

15   scheme that involved five or more participants or was otherwise

16   extensive under the meaning of the guidelines.  Here, there's

17   been briefing by both sides on that point.  And I do find that

18   there is a sufficient factual basis to find that Mr. Wedd was

19   an organizer or leader that involved five or more participants

20   or was otherwise extensive.  The basis for that is that, while

21   Miao and even Zhenya were also undoubtedly leaders -- for Miao,

22   for instance -- we'll take each of those schemes separately.

23   For Miao, he was a leader of the scheme in one sense, but also

24   there was another leader for the aggregation side.  It was the

25   individual who gave the authorization for the scheme to occur

1    on the Mobile Messenger platform, and then essentially

2    organized and gave authorization to individuals under him to

3    proceed with executing on that scheme. And that was

4    Pajaczkowski. And Pajaczkowski testified persuasively to the

5    Court that Mr. Wedd really was the one who introduced

6    Mr. Pajaczkowski to this opportunity -- it didn't happen the

7    other way around -- and that Mr. Wedd was in fact necessary for

8    Mr. Pajaczkowski to have gotten involved here.

9            For Zhenya, the scale of the Zhenya, Digi, and CF

10    schemes was such that, without Mr. Wedd's involvement, it is

11    exceedingly unlikely that they could have occurred, and indeed

12    there is no evidence that they would have occurred in the

13    absence of his involvement. While there was the Assifuah

14    scheme and so there is some demonstration that auto-subscribing

15    was able to occur without Mr. Wedd, that scheme, as we know,

16    failed quite quickly and without having really taken root. CF

17    and Digi we know were being monitored as among the largest

18    clients of Mobile Messenger. They very quickly became the

19    largest clients. And there is no indication that their

20    business was other than auto-subscribing.

21            So I do find that there is a sufficient factual basis.

22            In addition, in terms of extensiveness, I should say,

23    there were millions of -- well, thousands of consumers,

24    millions of dollars that were obtained from the scheme. The

25    scheme was nationwide. And, again, it required layers of

1    companies.

2           So I believe that the role adjustment is appropriately

3    includable for those factual reasons.  Apart from what you

4    folks have already argued in your papers, is there anything

5    else you would like to add?

6           MR. SERCARZ:  Only this, your Honor, since we're still

7    on the subject of the guidelines -- and I do it at the risk of

8    further damaging my credibility -- my client was the chief

9    operating officer of Mobile Messenger.  In that position, there

10   is no question but that he would have had to sign new

11   contracts.  He would have been in effect the gatekeeper.  I

12   quoted from the record as to those efforts by Mr. Pajaczkowski

13   and Mr. Eromo to describe my client's role in the offense, and

14   I would respectfully submit that they groped for terminology

15   that would be useful and terminology beyond that according

16   simply to someone who was in the position of authority over the

17   company.  I don't believe the guidelines were structured in

18   such a way that it is automatically, when it comes to these

19   calculations, that the person who has the most authority in the

20   company is by that definition in a leadership role with regard

21   to unlawful conduct that is taking place at the company.

22          I acknowledge -- and I'm going to talk about this a

23   little bit later -- that the defendant can be punished and

24   perhaps should be punished, given his role, given his authority

25   over the company as a whole, but since we're still discussing

I42AWEDSps

1    the guidelines, for whatever this is worth to the Court, your

2    Honor, I respectfully submit that the fact that my client was

3    the chief operating officer of the company does not make him

4    ipso facto the chief operating officer of the fraud at the

5    aggregator.

6            THE COURT:  All right.  So let me just take that head

7    on, which is, I do not base the Court's finding on a mere

8    position.  As I've described -- and we can rely only on the

9    Miao-Tatto situation for this point -- it's quite clear to the

10   Court -- and I do credit that Mr. Miao asked Mr. Wedd whether

11   he could auto-subscribe, and Mr. Wedd, in the Court's view,

12   agreed, that he could and that he would assist in that process,

13   and went back to his company to provide the structure for that

14   to be able to occur and to facilitate it.  So it's not the

15   position of authority as chief operating officer, it is his

16   direct and active involvement at the highest level that the

17   Court based its finding on.

18           But let me also make another point so that you

19   understand where my head is during this proceeding, because I

20   think it's a relevant point to the overall situation.  I don't

21   find that Mr. Wedd was conscious -- that the basis for

22   knowledge was conscious avoidance.  It is my view that he

23   understood and knew and participated directly and actually and

24   fully, and was all in on the auto-subscribing.  It was not

25   happening without his awareness, without his involvement.  I

1   don't think at this point in time that there is any real, in my

2   view, serious basis to believe otherwise.  So that is therefore

3   inconsistent with the view that simply his position as COO is

4   the basis for my findings.

5           I think we've all made our record on this.  And so I

6   will add the four levels for the role adjustment.

7           We get to obstruction of justice.  I think my comments

8   that I just made just now on my view as to Mr. Wedd's position

9   indicate that I am not of the view that conscious avoidance is

10  the basis for a finding of knowledge.  But let me just also

11  then go on to why I think that there is a basis for the next

12  enhancement, which is obstruction of justice.

13          Obstruction of justice.  I think that we –– I don't

14  know that anyone disagrees that, under Section 3C1.1, perjury

15  is a basis, under Application Note 4(B), for the inclusion of

16  an obstruction of justice enhancement.  I do believe that there

17  is an ample basis in the record to find that Mr. Wedd was

18  knowledgeable about auto-subscribing directly and clearly.  He

19  was not under any mistaken impression about this.  There were

20  meetings in which he participated where this was discussed,

21  where the nuts and bolts of it were agreed to, where he himself

22  agreed with Miao.  It's too consistent, too persuasive, for any

23  other determination.

24          Based upon that, the testimony that you folks, the

25  defense cited was testimony where it was amenable to an "even

1  if" argument, which is, even if you accepted that testimony,

2  there was still a consistent way of finding lack of perjury.

3  That let's put to the side.  Let me just read into the record

4  several portions of the trial testimony that are the basis for

5  the Court's finding of perjury.

6  Transcript page 1487 and 1488:

7  "Q. Mr. Wedd," he was asked on direct, "did you knowingly and

8  intentionally participate in a conspiracy to defraud consumers

9  through auto-subscribing?

10  "A. No, I didn't."

11  That's perjury.

12  "Q. Did you knowingly and intentionally engage in financial

13  transactions designed to conceal or disguise the nature,

14  location, source, ownership, or control of the proceeds of

15  auto-subscribing?

16  "A. No, I did not.

17  "Q. Did you knowingly use telephone numbers of the auto-

18  subscribers to auto-subscribe these customers?

19  "A. No, I didn't.

20  Page 1548, line 22:

21  "Q. Mr. Wedd, did you ever authorize Mr. Pajaczkowski to

22  provide" --

23  sorry.  Let me skip that one altogether because I'm

24  trying to focus on the other one.

25  1614.

1   "Q. Did you ever agree to allow Tatto to auto-subscribe on

2   Mobile Messenger's platform?

3   "A. No, I didn't.

4   "Q. Did you knowingly receive proceeds from auto-subscription

5   that took place by Tatto?

6   "A. No."

7           1649.

8   "Q. Did you know that either one of those companies," which

9   were CF and Digi in the prior Q and A, "was using their short

10  codes to engage in auto-subscribing in your aggregation

11  platform?

12  "A. No, I didn't."

13          Page 1651:

14  "Q. Did you become aware of that money you were receiving from

15  Zhenya as part of this revenue share was the proceeds in

16  auto-subscribing activity?

17  "A. No, I didn't."

18          1656:

19  "Q. Did you ever agree with anyone to engage in

20  auto-subscribing activity?

21  "A. No, I didn't.

22  "Q. Did you engage in auto-subscribing activity?

23  "A. No, I didn't did.

24  "Q. Did you ever use telephone numbers for the purpose of

25  engaging in auto-subscribing activity?

"A. No.

"Q. Did you ever knowingly receive money that you knew was the proceeds of auto-subscribing activity?

"A. No, I didn't."

So the basis of the Court's finding that there was perjury is those Q and As. I would note that there were also similar Q and As at the prior two trials, at trial I, trial II. That perjury was designed to mislead the jury, to influence the jury into either a hung result or into a defense verdict, and therefore it was an attempt directly to change the prosecution in the defendant's favor. So I do find that the obstruction of justice is appropriately includable.

That then adds two additional levels.

Is there any additional argument, other than what you folks have already included in your papers, that you'd like to raise right now?

OK. So the next one is the abuse of position of trust or use of special skill. The government requests this enhancement. If you look at the application notes for this particular provision in the guidelines, that when you are using your position to transfer a means of identification, as used under 18 U.S.C. 1028(d)(7)(C) and (D), that that can be the basis for the abuse of position of trust, that provision, that statutory provision, refers to telecommunication, identifying information, and unique electronic identification numbers.

1    Those are in turn properly considered to be the equivalent of

2    cellphone numbers from consumers.

3            In addition, the Court finds that that provision

4    refers to a position of private trust as well as public trust,

5    so I'm focused here on private.  It need not only be a

6    fiduciary, in the way in which a fiduciary in a trust, for

7    instance, is considered.  It can be a position of trust.  Here,

8    as evidenced by the statutory reference to the means of

9    identification, Congress had already previously linked position

10   of trust to one, an individual who had access to means of

11   identification and then misused that access in a manner to hurt

12   consumers.  That's what occurred here.  And the Court finds

13   that, in Mr. Wedd's position as COO, he set the direction and

14   tone of the company and got his highest-level folks organized,

15   among the highest-level folks organized to engage in this

16   fraud.  He had managerial discretion to do so, but more

17   importantly than just having that discretion, he in fact

18   utilized it for this.  His position did contribute to the

19   facilitation of the scheme, by allowing Tatto to move the codes

20   over, by signing, as I've said, the CF and Digi contracts, but

21   also, more importantly, by concealing proceeds through the

22   multiple layers of companies, and also concealing and assisting

23   in the concealment of the activity overall.

24           So the application of this enhancement is consistent

25   with the statute, the congressional intent, and the case law in

1    this area.  So I do find that that is the -- the two levels are

2    applicable.  Anybody want to add anything to what they have

3    already said?

4          The last arguments are relating to a request for a

5    downward departure.  I am not going to depart.  I am going to

6    vary downwards.  But it won't be a departure.  I have looked at

7    the *U.S. v. Algahaim* case.  There I would note, first of all,

8    there was a base offense level of 6, not 7.  It wasn't the

9    highest.  But there was argument that the exponential

10   increase -- it was, I think, three times in that case -- of the

11   base offense level by the loss amount was something that the

12   court could take into consideration and, by virtue of the

13   remand, should take into consideration, when determining

14   reasonableness of overall sentence.  That is certainly true.  I

15   am considering the loss amount in connection with Mr. Wedd's

16   behavior.  I've already indicated that my intention is to vary

17   downwards, that while there is a very large amount of money at

18   issue and it does increase Mr. Wedd's guidelines by a lot

19   because of that, I am allowing for consideration of the extent

20   to which Mr. Wedd's overall punishment should not be based

21   purely on some sort of numerical algorithmic or other simple

22   loss enhancement number.

23         I would also, however, note the argument that there

24   were overlapping enhancements for the same conduct.  That was

25   another argument that was made.  I don't find that that is in

1    fact the case here.  Each of the particular provisions that we

2    talked about that have led to enhancements are seeking to

3    address separate behavior, in terms of, for instance, the

4    number of victims, which is consumer oriented, the role

5    adjustment, which has to do with the manner in which the

6    defendant actually executed the scheme, the obstruction of

7    justice, in terms of the jury particularly.  The abuse of

8    position is really about the ability to utilize a particular

9    data set.  So these are not the kind of multiple overlapping

10   enhancements that one sees, for instance, in something like the

11   child pornography cases, where it can really become more truly

12   overlapping.

13         Then there is also an argument about disparities in

14   other sentences between -- in a number of instances where fraud

15   sentences are not guidelines sentences in this district as well

16   as elsewhere.  I am taking that into consideration in terms of

17   a variance.  And that is part of my determination as to why a

18   variance here is appropriate.

19         I think based upon what I've said, we end up at an

20   offense level 45, which then adjusts downwards to 43 because

21   the maximum offense level under the guidelines is 43.  Is there

22   anything that -- that's where I'm ending up.  Is there anything

23   anybody would like to add?

24         All right.  The Court does confirm the guideline as

25   43.  What that means in terms of months is, if there are eight

1    counts of conviction, six of which have 20-year mandatory --

2    sorry, not mandatory -- 20-year maximum sentences, the maximum

3    statutory penalty for six of the counts are 20 years, and so

4    because it would otherwise be indicated as life, you take the

5    240 months of each of the separate counts of conviction,

6    multiply it by 6.  So it's 240 times 6, which equals 1440.

7    That is the number of months attributable to the nonaggravated

8    identity theft counts.  Count Three and Count Seven are

9    aggravated identity theft.  They were separate and treated

10   differently because they have two-year mandatory consecutive

11   sentences.  That is both the mandatory sentence and the maximum

12   sentence.  And so it's 24 months for each of Count Three and

13   Count Seven.  It's a total of 48 months.  And so the way to get

14   the number of months for the guidelines calculation is to take

15   240, multiply it times the six counts of conviction, come up

16   with 1440, then 24 months times 2 for Counts Three and Seven.

17   That's 48 months.  That adds up to a total of 1488 months, is

18   the guidelines range that is possible, given the statutory

19   maximum sentences for this defendant.

20           Is there any additional point anybody would like to

21   make?

22           MR. COOPER:  No.

23           THE COURT:  No.  All right.  Let's go on, then, to the

24   next piece, which is to hear from you folks.  And we've been

25   going for almost an hour.  We can do two things.  One, we could

1  take a very short break now, or we could just go right into it

2  and then finish.  But I'm thinking that you folks may want to

3  talk for a little while.  And so maybe we should just take a

4  very short, like three-minute break now, stretch our legs, and

5  come back?  All right.  Let's do that.  Let's take a very short

6  break and come back.  Thank you.

7          (Recess)

8          THE COURT:  The way in which I typically proceed is, I

9  have the government go first, the defense counsel go second,

10  and then lastly give defendants the opportunity to have the a

11  last word before sentence is imposed.

12          Mr. Cooper?

13          MR. COOPER:  Thank you, your Honor.  At the outset, we

14  just note that there's certainly, based on the letters and the

15  presence in the courtroom, there's a lot of friends and family

16  support from Mr. Wedd.  And the letters that the defense has

17  submitted do describe one side of the defendant that the Court

18  certainly should take into account as a factor under 3553(a).

19          But it's clear to the government that the letter

20  writers don't know the side of Mr. Wedd that was illuminated

21  through the trials in this courtroom.  And we want to discuss

22  that side and a few of the sentencing factors that are

23  applicable there, in particular, the seriousness of the

24  offense, the defendant's role in the offense and lack of

25  remorse, and the particular need here for general deterrence.

1    So I'd like to take each of those in turn.  First, in

2    terms of the seriousness of the offense, this, as we say in our

3    submission, was a true Main Street crime.  The victims here --

4    and the PSR says thousands.  We believe the number approaches

5    the millions.  The victims of this offense came from all walks

6    of life.  The only limiting factor here was people who had the

7    misfortune to have their cellphone numbers in the Mobile

8    Messenger database for one reason or another.  That was the

9    only limiting factor.

10    And so folks who were victims of this fraud ranged

11    from the very wealthy to the people who could not afford on a

12    monthly basis to have $10 stolen from them.  And the defendant

13    here knew full well that, for many of the victims, that

14    incremental ten dollars might mean the difference between

15    having their cellphone operate the next month and having it

16    shut down for lack of service.

17    At trial, the Court may recall, there was testimony

18    from the defendant about his billability project at Mobile

19    Messenger, which was an analysis to determine which telephone

20    numbers would be able to be billed.  The Court may remember

21    there were some limitations like people who have prepaid

22    cellphones, people whose cellphones may be shut down if a

23    premium SMS charge were to be placed on that phone.  So the

24    defendant knew full well that sending out these charges to

25    people who hadn't authorized, asked for, or accepted them

could, for many of those victims, be the difference between

having their cellphone, which is a vital link to the world

nowadays, between having that and not having that.  And that is

quite significant in the government's view.

In that regard, one aspect of the defense's written

submission struck us as particularly problematic, and we

address it in our submission, but I do want to amplify it

today.  There was a suggestion, in a few places in the

submission, that somehow the defendant should be given somewhat

of a benefit because the average loss amount to consumers was

relatively low, $10, $20, maybe $30.  And that is a very

dangerous assertion for a couple of reasons.  First, people who

have money stolen from them, $10 at a time, are every bit as

deserving of the protection of our laws as wealthy individuals

who have millions of dollars stolen from them.  There should

not be a distinction, in terms of number of victims, based on

that.

That type of thinking is essentially carrying forward

the type of thinking that Mr. Wedd and his co-conspirators

operated under at the time they committed the fraud, which is,

if we do a little bit of fraud over a large number of people,

the chances of success, the chances of getting away undetected,

are going to be higher.  And indeed, if you step back and think

about it, it makes this type of fraud much harder to detect,

because people who are penalized $10 at a time might be less

1  inclined at the outset to even notice that they were the

2  victims of a fraud, but even more, once they notice, there is a

3  lot less incentive for them to go forward and report the fraud,

4  to contact the police, to contact the FBI or the IRS, to even

5  complain to the telephone company, because of the low value.

6  There are many who may just have paid the amount without

7  thinking about it, thinking it was an additional surcharge or

8  tax that the telephone company put on their bill and that they

9  had to pay it.

10       And so in terms of incentives to victims to report,

11  it's just that much harder when you have a lot of victims who

12  are stolen from a little bit at a time.  So we believe there

13  should be no benefit given to the defendant based on the

14  average loss amount.  If anything, it's more pernicious to have

15  a fraud that steals a little bit at a time from a lot of

16  people.

17       The second point we want to make is about the

18  defendant's role in the offense and lack of remorse.  The

19  defendant's submission pits him in a certain sense as a pawn of

20  Miao and of Zhenya and of others acting within Mobile Messenger

21  in an unscrupulous fashion.  I'm not going to belabor this

22  point because the Court has already indicated that the Court

23  does not view this as a crime of a conscious avoidance but

24  rather as a willful and intentional crime.  But the point I do

25  want to make is that the defendant's role here was absolutely

1  essential.  He was the but-for cause of millions and millions

2  if not hundreds of millions of dollars of loss.  And he has

3  shown a complete lack of remorse, in his testimony at trial and

4  in the sentencing submission where he essentially blames others

5  and asserts that this was at most a case of negligent

6  supervision rather than intentional and willful conduct.

7       His own letter doesn't address the offense.  Now,

8  that's his right and we understand he's preserving his appeal

9  rights, but nothing in the letter puts in context, or seeks to

10  explain the conduct at issue.  Nothing makes it any bit less

11  willful and intentional than it actually was.

12       And the last point we want to make is on general

13  deterrence.  There are really two separate points here.  The

14  first, which will I'll describe first, is a similar general

15  deterrence point as the Court sees for any similarly situated

16  white collar fraud defendant.  The second one is particular to

17  this offense.  But first, this is a crime that appears to have

18  been committed for two motives: first, for the defendant's

19  personal financial benefit, and, second, for the financial

20  benefit of the defendant's company, Mobile Messenger.  On the

21  first part, as the trial evidence showed, during the time the

22  defendant engaged in this conduct, he lived a high-flying,

23  lavish lifestyle.  There was testimony in the exhibits about

24  expensive cars, multimillion-dollar real estate, major

25  investments in Hollywood productions.  So in part he stole from

I42AWEDSps

victims, from main Street victims, to fund his own lavish

lifestyle.

The second part was to help his company.  And to be

clear, that's a new defense and the government does not believe

that that in any way mitigates the extent of the harm of the

conduct.  The fact that some part of the motive was to help a

corporation that he was wound up in rather than himself does

not mitigate the harm here, because from the victims'

perspective, it doesn't matter whether the money was stolen to

go to some car or some apartment building or to go to help prop

up Mobile Messenger's revenues to make their quarter numbers or

their year-end numbers.  The fact is that the money was stolen

and Mr. Wedd was central to that.

The white collar fraud defendants like Mr. Wedd should

factor in the fact that if they get caught, there will be a

substantial term of imprisonment out there, when they decide

whether or not to engage in fraud.

But the second element is particular to this crime.

And we discuss this a bit in our submission.  Mr. Wedd was

essentially synonymous with Mobile Messenger in the United

States.  As he testified to, he was the first employee in the

U.S.  He raised his hand.  He came here, and he built a company

in the United States.  He rose to the seniormost position.  And

he used the company and its facilities to commit this fraud.

The compliance function at this company, at Mobile

1 Messenger, was corrupted by Mr. Wedd.  Now, to be sure, others,

2 including Mr. Pajaczkowski, bear their fair share of

3 responsibility.  But Mr. Wedd is the one who created this

4 culture of individuals with respect to auto-subscribing using

5 their positions to get money.  He's the one who used Mobile

6 Messenger's compliance function, that should have been looking

7 out to detect crimes, to stop them, and to report them to law

8 enforcement, he is the one who told Miao, go see Paj, go see

9 the head of compliance, he's going to be able to help us keep

10 this crime undetected so we can get more money.

11         And that is a particularly pernicious factor when you

12 think about corporate crime, the fact that this sentencing is

13 an opportunity to send a message that compliance functions at

14 companies, like the one at Mobile Messenger, should not be

15 corrupted, should not be perverted, to advance individuals'

16 corrupt ends, but should be doing what it's supposed to be

17 doing, which is to be a watchdog on the lookout.

18         Other than that, unless the Court has particular

19 questions, we'll rest on our submission.

20         THE COURT:  Thank you, Mr. Cooper.

21         MR. COOPER:  Thank you, your Honor.

22         THE COURT:  Mr. Sercarz.

23         MR. SERCARZ:  Thank you, your Honor.

24         Your Honor, there are three things that I'd like to

25 do, and I'll try and do them quickly.  I want to talk about the

government's sentencing submission and the comments that were

just made by Mr. Cooper. I want to talk about the concept of

deterrence, which clearly is an important goal in any sentence

and which it is clear will be an important goal in this one.

And then finally, I want to talk about the defendant's

character.

First of all, there's something that has to be stated

and made very clear right at the outset. The government

devoted a great deal of its argument just now to the

defendant's sentencing submission and how the defendant's

sentencing submission indicates a lack of remorse and indicates

to the government certain tell tale things about the

defendant's character. So let's be absolutely clear. He

didn't write that submission. I wrote that submission. I

wrote that submission because I'm his lawyer. I wrote that

submission because I have an obligation to him. I wrote that

submission because, in the guidelines regime in which we

operate, I have an obligation to try and mitigate the damage

that occurs from the kind of piling on of points that probably

became apparent to everyone in the audience and that has caused

judges in this district and elsewhere to decry the outcome of

the guidelines calculation in white collar cases.

And to give but one clear example, the submission that

I made is attacked because the fraud is a fraud on a broad

market which does not damage to any great extent individual

1   victims, thereby making it less likely for them to complain and

2   thereby making it less likely for the fraud to be detected.  I

3   want to quote to the Court from the guidelines themselves and

4   the downward departure considerations at Section 2B1.1(C),

5   "Downward Departure Consideration."  "There may be cases in

6   which the offense level determined under this guideline

7   substantially overstates the seriousness of the offense.  In

8   such cases, a downward departure may be warranted.  For

9   example, a securities fraud involving a fraudulent statement

10  made publicly to the market may produce an aggregate loss

11  amount that is substantial but diffuse, with relatively small

12  loss amounts suffered by a relatively large number of victims.

13  In such a case, the loss table in subsection (b)(1) and the

14  victims table in subsection (b)(2) may combine to produce an

15  offense level that substantially overstates the seriousness of

16  the offense.  If so, a downward departure may be warranted."

17          That was my use of the guidelines to try and mitigate

18  the damage that is done to my client by these guidelines, which

19  I respectfully submit give the Court at best a color-by-numbers

20  opportunity to create a portrait of my client.  But soon

21  enough, your Honor, you won't be sentencing the crime; you'll

22  be sentencing the individual that sits next to me.  And knowing

23  you as I do after having spent my three trials in here, you

24  have enough information, enough capability of nuance, enough

25  wisdom to offer a sentence in this case which is not a

1   color-by-numbers sentence of this defendant.

2        Is this a serious offense?  Yes.  All right, hell yes.

3   But that's the beginning of the inquiry, not the end of the

4   inquiry in this case.  With all due respect to the government.

5        With regard to the issue of deterrence, I've spent

6   enough time in here, and I've taken up enough time that I hope

7   the Court will accord me an additional two minutes to tell you

8   the story which has the virtue (a) of being true, and (b) it

9   doesn't have a street lamp in it.  OK.  In 1986 I was a young

10  pup in this practice, and I came to a firm which was named

11  Sercarz Schechter & Lopez.  And the lead partner, who put his

12  name last deliberately, Frank Lopez, was among the most

13  ingenious lawyers that I've ever had an opportunity to

14  encounter.  And he handled more than his fair share of the most

15  complex organized crime and narcotics cases ever tried in the

16  courthouse across the street.  And among them was the trial in

17  the organized crime commission case.  And it was Frank Lopez's

18  ingenious idea that the head of the Colombo crime family, who

19  had already been sentenced and given a life sentence in the

20  Colombo organized crime case, ought to represent himself in the

21  commission case so that the Court would have an opportunity to

22  hear from him without the necessity of Mr. Persico having to

23  testify under oath.  The defendants were convicted in short

24  order, and they were sentenced before Judge Richard Owen in the

25  building across the street.  And it was clear which way the

1  wind was blowing after about two or three sentences.  The first

2  two heads of the families received a hundred years' sentence.

3  And it came time for Mr. Persico and a defendant named Gennaro

4  Langella, who Frank Lopez represented at the proceeding, to

5  take their turn before the bench.  Frank turned to the judge

6  and he said, your Honor, my client finds himself in very much

7  the same position as that great American patriot, Nathan Hale;

8  he regrets that he only has one life to give to his country.

9  The judge laughed out loud and gave him a hundred-year

10  sentence.

11         I tell you this story for two reasons.  The Court can

12  take a broader view of the concept of deterrence.  It's been

13  from 1986 to 2017, your Honor.  Serious crimes continue to be

14  committed, crimes that involve death, personal injury, the

15  distribution of narcotics on the large scale, fraud on the

16  markets, and I'm going to urge the Court, before you impose

17  sentence in this case, to take a moment to consider whether the

18  experiment that is the sentencing guidelines and the imposition

19  of these enormous guidelines based on no factor more than the

20  concept of fraud loss are really yielding the kinds of results

21  that are warranted in these cases.

22         I also tell you the story for another reason.  If my

23  memory serves me correctly, every defendant in that courtroom

24  was eligible for parole after ten years.  The people who

25  crafted the sentencing regime in that day and age had the

1   wisdom not to impose upon judges the requirement that they make

2   a futuristic prediction about when it is that a defendant will

3   be fit to return to society.  It enabled a parole department to

4   make that decision in real time, based on a real evaluation of

5   the defendant, with time for heads to cool and time to evaluate

6   the defendant's sentencing adjustment.  And you don't have that

7   opportunity in this case.  No judge has it, in a guideline

8   case.  Instead, your Honor, what you do have is the principle

9   of parsimony.  There are requirements that are supposed to

10  guide the court in imposing a sentence.  And in every sentence

11  the court is tasked with imposing a sentence that is sufficient

12  but not greater than necessary to meet the goals of sentencing,

13  deterrence, general and specific, and those other goals that

14  are enumerated in the statute and with which the Court is well

15  familiar.

16          I recommended a sentence in this case.  And I didn't

17  do it to pick a number to start a negotiation.  I did it

18  because I hoped to help frame the debate.  You took the bench

19  in the Fraser Thompson sentence.  You said, I have a range in

20  mind.  And it provided a landscape for negotiation.  I came to

21  you with a number, 84 months, seven years, and I asked the

22  question, what is the marginal deterrent value, what is the

23  marginal additional deterrent value, what additional number is

24  sufficient but not greater than necessary to meet the goal of

25  deterrence, to speak to that goal specifically.  And I make the

I42AWEDSps

observation, your Honor, that these three trials and these

proceedings did not occur in a vacuum.  This was a heavily

regulated industry.  The dominoes began to fall in 2013 with

actions by state attorney generals, with an FTC proceeding that

resulted in obtaining for consumers tens of millions of dollars

that had been taken from them.  And that is a factor to be

considered under the subject of deterrence as well.  Money for

victims is one of the goals of deterrence.

I would make the observation that, in considering the

defendant's sentence, the Court also needs to consider the fact

that he is deportable.  And I commend to the Court's attention

the letter by Mr. Sickler, who is an expert in the field, the

content of our submission, and the fact that any sentence that

is imposed is going to be more onerous on my client in several

respects.  He's already been remanded based on flight risk,

part of which no doubt came from the fact that he is not a

citizen of this country.

The defendant is going to be subject to conditions of

security throughout the period of his incarceration that are

more onerous than the defendants similarly situated will have

to endure.  The defendant will not receive good-time credit.

The defendant will not have the opportunity to participate in

the kind of enrichment programs that are ordinarily afforded to

defendants similarly situated who find themselves in the

custody of the Bureau of Prisons.  The defendant's security

1  level is going to be impacted, with all that that means -- and

2  I commend you to Joel Sickler's letter.  At the end of this

3  term, the defendant will not have the opportunities for home

4  confinement, supervised release, community confinement that are

5  ordinarily afforded to defendants under his circumstances.  The

6  defendant will be held in jail for an extra length of time

7  while the efforts are made to put him into a location from

8  which he can properly be removed to the country of his birth.

9       All of this, most respectfully, is a part of the

10  basket that goes under the title "deterrence."  Anybody who

11  looks at the sentence that this defendant is going to be made

12  to endure has to understand all of what befell my client

13  beginning in 2014, not only what happens to him in this

14  courtroom.

15       Excuse me for one moment.

16       The government made an argument which, with no

17  disrespect intended to Mr. Cooper, for whom I have enormous

18  regard, strikes me as glib, and it's one that I want to treat

19  for the rest of my comments.  He says to you that the people

20  that have traveled all this way -- and there are people that

21  have come from a long way to be here today -- they know the

22  Darcy Wedd that they met on the outside, but they don't know

23  the Darcy Wedd that was illuminated by the events that were

24  portrayed in this courtroom.  And I respectfully submit that

25  people do not develop two characters.  My client has but one

1    character.  If you're looking for the acid test of character --

2    and I'm going to go into this in a little bit more detail

3    momentarily -- then I commend you to the presentence report at

4    paragraph 112, your Honor.  I read the transcript of the Fraser

5    Thompson sentencing, and my eyebrow went up and I smiled when

6    the Court talked about how so often in fraud cases you can go

7    to the financial affidavit and find evidence of -- and I'm

8    going to use your word -- shenanigans, in quotes, and that may

9    be a very good way to see, to measure a defendant's level of

10   remorse and what a defendant is really about.  For whatever

11   this is worth, your Honor, here's another test that maybe you

12   can employ in some case in the future to help the Court make

13   that same sort of determination.  When you read character

14   letters on behalf of a defendant, you'll take them and

15   presumably you'll apply some sort of a discount and say, these

16   are people that love the defendant; maybe they're people that

17   have gotten something from the defendant when he was rich and

18   when he was riding high.  So my suggestion is this.  To the

19   extent that you're able to find it, look for the statement by

20   the estranged family member.  Look for the statement by the

21   ex-wife.  Look for the statement by the disgruntled employee.

22   And then you won't have to apply that discount before you

23   really get to the nub of the defendant's character.

24        This is the defendant's ex-wife, your Honor, Melanie

25   Camp.  And I quote: "During a recent telephone interview with

1   Ms. Camp, she informed that in September of 2007, they met in

2   Las Vegas, Nevada.  She corroborated their separation and

3   divorce.  According to Ms. Camp, their marital problems

4   surfaced prior to his arrest.  Ms. Camp believes that the

5   defendant's addiction to alcohol may have contributed to their

6   marital problems.  In terms of his arrest, Ms. Camp stated that

7   she was surprised and she finds it difficult to comprehend

8   because she knows some of his co-conspirators.  Ms. Camp

9   reported that she respects the criminal justice system.

10  Reportedly she has never known the defendant to act out of

11  malice or greed."  Let me repeat: never known him to act out of

12  malice or greed.  "According to Ms. Camp, the industry is

13  complex.  In general she described the defendant as someone who

14  is generous and supportive, both emotionally and financially to

15  others, including family members.  Ms. Camp stated that she has

16  no ill will toward the defendant and wishes him well."

17          Your Honor, you received 57 letters, some of them as

18  late as today.  But there's one character letter you haven't

19  read yet.  That's my character reference for my client, Darcy

20  Wedd.  The following is my character reference for my client.

21          "This sentencing proceeding represents a daunting task

22  for me.  The sentencing guidelines call upon this Court to

23  impose upon him a sentence that would result in his

24  imprisonment for the rest of his natural life.  Your Honor, I

25  cannot compete with your wisdom or your experience in handling

sentences under the guidelines regime.  Moreover, the firm of

Paul, Cooper & Beidel is far more adept than I at harnessing

the case law commentaries and the guidelines themselves in

support of what they deem to be an appropriate result in this

case."

And as I speak to you now, my heart is in my throat.

Your comments thus far and at prior sentences leave me with the

concern that, in your view, my client is a smooth-talking

defendant with no regard for the results his behavior had on

the welfare of those whose lives he touched.  If that's the way

you feel, most respectfully, you have him pegged wrong.  You

see, I know the character of this man better than the rest of

those involved in these proceedings.  I've represent him for

the better part of three years.  I've met with him together

with other lawyers and their clients in Los Angeles, and I've

met with him alone in my office in New York.  I've been his

advocate and seen him through the crucible of three trials.

I've waited with him while three juries deliberated on his

future.  And I was the one who sat with him, your Honor, in a

jail cell and told him that his beloved father had passed away

and would never be there to see him again.  In short, while

I've always been with him while he has operated under the

stress of a criminal indictment and an uncertain future, I have

been with him when life seemed, relatively speaking, to be

good, and I've been with him when it was not so good.  And

1   here's what I've learned.  First of all, if a person's

2   character is defined by how he or she behaves when no one is

3   paying attention, you only need to read the letter of one

4   person, his cell mate, Mr. Van Manen, to learn all that you

5   need to know about Darcy's character.

6          Mr. Van Manen, for those in the audience, was an

7   inmate who was plopped into Darcy's jail cell very shortly

8   after he arrived there and suffering through the ravages of

9   withdrawal from a serious heroin addiction.

10          "When Mr. Van Manen was placed in that cell with

11   Darcy, he didn't know anything about Darcy's background.  He

12   didn't know about the charges against this defendant.  He

13   didn't know that Darcy, newly deposited on 9 South himself, was

14   terrified.  All he knew was that he was dealing with the

15   ravages of heroin withdrawal and Darcy was there to help.

16          "Your Honor, I submit to you that the reason why some

17   white collar defendants eventually return to criminal activity

18   is that they cannot function without the power and the wealth

19   and the status conferred by their fraudulent conduct.  But on 9

20   South Darcy had no power.  Darcy had no wealth.  Darcy came

21   armed only with his good character.  He wore his prison

22   jumpsuit, not a fancy set of clothes.  He didn't drive a

23   Bentley on 9 South.  The only armature he had is his good

24   character, the one good character that he possesses.  And he

25   did what he's always done.  He offered his care and attention.

He helped.

        "This Court need have no worry about how Mr. Wedd will

perform in the world when he leaves his jail cell for the final

time.

        "Second, in its sentencing submission, the government

describes Mr. Wedd as having been remorseless, in perpetrating

the fraud of which he has been convicted.  The glib response

would be to say that no one feels remorse while they're engaged

in criminal conduct.  I have further responded by indicating

that, to the extent that the sentencing submission is perceived

by the government as limiting a lack of remorse, that was my

submission.

        "But I know a little bit more about the meaning of

remorse, and I know a little bit more about the nature of my

client's character.  I've encountered my share of defendants

who, when confronted with overwhelming evidence of their guilt,

quickly determine that it was in their own selfish best

interest to immediately enter a guiltily plea and/or

participate with the government in the process of apportioning

blame.  The authors of the federal sentencing guidelines have

seen fit in their wisdom to reward this behavior with three

points off for acceptance of responsibility.  The government in

its wisdom has seen fit to reward its witnesses with the

expectation of a sentence reduction pursuant to the standard

cooperation agreement employed here in the Southern District.

I'm all too familiar with transactional remorse, with

institutional remorse.  When Darcy testified at the first trial

and Mr. Cooper questioned him, as he did, as he had every right

to do, as he should have done, about the many ways in which he

could have stopped Lin Miao from further engaging in

auto-subscribing when he learned about it at that meeting in

San Diego, in response to one of Mr. Cooper's questions, Darcy

added to his answer: 'I know I could have done more and I'll

regret it for the rest of my life.' Mr. Cooper said that was a

nonresponsive answer, and in the context of the trial, he was

right.  It may not have been relevant then, but it's relevant

now, your Honor.  My client, Darcy Wedd, is full of remorse.

His remorse is real.  He's remorseful for the harm done to the

countless innocent victims whose monthly phone bills were

padded.

        But that's not the true measure of his remorse.  His

remorse is something he can't run away from.  It comes to him

at night before he gets up in the morning.  It comes to him

before he engages in the chores of an orderly.  It comes to him

before he goes up to the 11th floor to exercise on the roof and

after he's on the way back down.  It's a searing pain that

comes to him whenever he thinks about what he did to put

himself here.  And I know he experiences this pain because I

know about this man.  I understand about this man.  And the

pain comes from the fact that he knows in his soul that he

1    could have done more to be part of the solution for premium

2    short messaging service, and he could have done less to be part

3    of the problem."

4              And, your Honor, that searing pain is the best

5    insurance that you have that Mr. Wedd will never again grace

6    the doors of a courtroom as a criminal defendant once he

7    secures his release.

8              "Third" -- and I don't have much more to go.  This

9    filibuster is almost over.  "At all three trials, I described

10   Darcy has someone who has an appetite for adventure and a

11   thirst for risk.  Of course when I said this I was referring to

12   his decision to come to New York, where he had no family or

13   friends, to rent an apartment on John Street, with a bedroom

14   and a living room big enough to hold a desk, and to establish

15   Mobile Messenger here in the United States.  This Court, which

16   possesses a remarkable skill at remembering statements by

17   counsel and remaining counsel of their words, at what may be

18   the most unfortunate of times, reminded me of my words when it

19   was considering whether or not Mr. Wedd was a flight risk at

20   the time of his remand.  Your Honor, I stand by this situation

21   of my client.  And fully mindful that you will have the last

22   word in this case, I would suggest this:  Personal growth is

23   nothing less than a lifelong adventure.  And change, real

24   change, requires courage, flexibility, and a willingness to

25   embrace risk.  Darcy has those characteristics in abundance.

1  And they will serve him well in the sentence that he must

2  engage, your Honor.

3          "In conclusion, what I would say is this.  All I've

4  learned about this man tells me that whatever sentence you see

5  fit to impose, he'll bear up under it with good grace.  He

6  simply knows no other way.

7          "As always, your Honor, I thank you for this

8  opportunity.  Maurice Sercarz, the guy who helped tie up your

9  courtroom for the better part of 2017."

10          THE COURT:  Thank you, Mr. Sercarz.

11          Mr. Wedd, would you like to address the Court before

12  sentence is imposed?

13          THE DEFENDANT:  Yes, just briefly, your Honor.  A lot

14  of what I wanted to say was just recounted by Maurice.  What I

15  would like to say to you is that I'd like a second chance.  I

16  know that I have a lot to offer.  I've got plans for how I'm

17  going to approach my sentence in a positive way, not just for

18  myself but also for the people that -- whose paths that I

19  crossed.  But I just want to do something after my -- after I'm

20  released that better matches my personality.

21          And that is all I have to say.  I'm sorry it wasn't

22  very eloquent.  But I just appeal for a second chance, and I

23  know I do a lot to offer.  Thank you, your Honor.

24          THE COURT:  Thank you, Mr. Wedd.

25          Imposing sentence is the hardest things that a judge

1   does, because it's one human being sitting here looking another

2   person, another human being in the face, in the eyes, Mr. Wedd,

3   and telling you how long you're going to spend behind bars.

4   And when I do that, it is the most humbling thing I can do, and

5   a kind of power that I don't think any single person should

6   have.  If sentencing could be done differently, I would have

7   three judges do it, and we would come up with a way in which

8   the three judges would, together, arrive at a sentence that

9   would reflect a spectrum.

10          But that's not the way our society has seen fit to

11  sentence defendants.  And so I try very, very hard to ensure

12  that I have considered what I think other judges would find

13  reasonable.  I know that there are judges who find sentences I

14  impose unreasonable.  And I know there are judges who find the

15  sentences are reasonable.  And what I try to do is, for every

16  single sentence, come up with one that's reasonable, that is

17  sufficient but not greater than necessary.

18          Defendants like you present a very difficult

19  situation, because I have sat with you through three trials and

20  I have seen you through three trials, and I understand that

21  you're not a bad guy.  And I find, with, frankly, with a lot of

22  fraud defendants, frankly, Mr. Thompson, since Mr. Sercarz has

23  read that transcript -- I said similar remarks then -- they can

24  often be very charming.  They're usually highly intelligent,

25  more educated than not, and they're people who, like criminals

1     of -- who've done other kinds of crimes, are multifaceted.

2     They're not all bad.  They're not all good.  They're not

3     defined by all the goodness that's in their character letters

4     or all the badness that's found within their crimes.  There's a

5     complexity to the human spirit.  There's a complexity to human

6     nature.  And that's what I find.

7             With you, it is important that you understand the

8     sentence that I impose, because, while there are a lot of

9     people here, as I also say at sentences frequently, you are the

10    only one who is actually going to go to the cell after this and

11    have to start serving that time.  Indeed, you've already begun

12    to serve that time.

13            So I'll explain it to you as best I can and hope that

14    when you think about on this proceeding, you will understand

15    that even if you don't agree with it, you at least heard the

16    words that I put around it as the reason for the sentence and

17    understood that I thought about it, very long and very hard.

18            I have to start with the guidelines, but I also have

19    to ask whether they're reasonable.  I've told you folks already

20    in this proceeding that the guidelines suggest life, and I am

21    not -- that life is not on the table, that I am not considering

22    a life sentence.  This is not that kind of crime.  Your conduct

23    was not that kind of conduct.

24            I nevertheless then go to where, then, in the range

25    below life do we fall.  It's a big range.  You're 41 years old.

1    40.  Soon to be 41.  Right?  Sometime this year.  40 years old.

2    And, God willing, there's a lot of life ahead of you.  And so I

3    have to turn to these factors, the 3553(a) factors in the

4    federal sentencing statute.  And they ask the Court to come up

5    with what is a sufficient but not greater than necessary

6    sentence, that reflects a variety of purposes of sentencing.

7    They are captured in different words.  They are captured in

8    things like general deterrence and personal deterrence and

9    seriousness of the offense.  And they're captured in things

10   like whether or not there are educational, medical,

11   correctional, or vocational treatment that is needed, whether

12   or not a particular sentence promotes respect for the law,

13   whether or not a particular sentence is a just sentence.  And

14   ultimately what they're doing is, they're trying to capture

15   sort of the philosophy of sentencing behind that, whether it's

16   retribution for the victims, for our society, where the social

17   contract has been violated, whether it's some concept of

18   rehabilitation, or incapacitation, and other concepts that were

19   put in there.

20        So I start off with the seriousness of the offense.

21   People often find that to be the least attractive part of any

22   sentencing proceeding because it goes back that's not about

23   just who the defendant is in terms of the mitigating factors,

24   but also it's really about why we're here at all, which is,

25   what is the crime.  We've already, I think, had some discussion

1  of that already.  It was a massive fraud that touched at least

2  many thousands of people, and it touched them in a way that was

3  particularly pernicious, because, while it didn't take a large

4  sum from any one of them, it caused a large number of them to

5  have discomfort, pain, hardship at varying levels, depending

6  upon their personal circumstances, while their money, whether

7  it was perhaps just an annoyance to them that they lost 9.99,

8  or perhaps a hardship to them, where they could not pay their

9  bill because they lived paycheck to paycheck and couldn't get a

10  phone company to refund it quickly enough and had a bill that

11  they then couldn't meet.  Across that spectrum, the human

12  experience lies for the victims.  And there were thousands of

13  them.

14      And these were people, some of whom for sure, were

15  individuals who earned minimum wage.  So for the $10 that went

16  into not even a cocktail that it was used for when it was given

17  to somebody as a result of the fraud and then used to pay some

18  bill that happened to be associated with cocktails on the

19  beach, that $10 represented them standing at the counter for an

20  hour, maybe a little more.  It represented them doing whatever

21  it was that they had to do just to be able to have that money

22  taken and used for whatever pleasurable expense, to buy part of

23  a Bentley, to buy property, I don't know.

24      But the reason that I am here to impose sentence is

25  because we have deemed as a society that the victims need a

voice, that society has to say, you cannot do this without

stopping and understanding the cost, the cost both to violating

our social compact and then the cost to the real human beings

who you affect.

So I think about the nature of your crime. I think

about the victims. I think it was a crime that had so many

deliberate moments in it, so much intentional conduct. I

reject entirely the idea that you didn't know exactly what was

happening and agreed to engage in it, for whatever reason,

sufficient unto yourself. I do hope you would never do it

again. I do hope that that is behind you, that life will take

you in different places.

There is unfortunately a high degree of recidivism for

fraud. That's not true for everyone. And hope springs

eternal, has to; otherwise we get very discouraged doing what

we do.

So I start off and I think a lot about the seriousness

of the offense and I turn to who you are. And I think you've

been different people at different times in your life. You've

always been a hard worker. Even when you were at Mobile

Messenger committing fraud you were a hard worker. It's not

like you weren't showing up to work and putting in a lot of

hours and trying, at the same time that you were committing

fraud, to take the business in a different direction. That's

just part of the complexity of who you were. You worked when

1    you were young.  You worked hard as a young boy, so far as I

2    can tell from the letters and from your own letter and from

3    your mother's letter, from how it's progressed throughout.  But

4    you were somewhere who, somewhere in there, was able to

5    essentially take from others, maybe without really realizing

6    that the people that you encountered every single day you might

7    have been -- the valet at the hotel that you would stay at

8    where you would have your car parked, it may have been that

9    valet you were you auto-subscribing.  So when you were giving

10   them that tip, that tip was coming back at you.  Unclear.

11          There's a callousness in the behavior that needs to be

12   recognized.  And I do recognize it.  On the other hand, I do

13   also want to give you credit for and recognize the part of your

14   person that's hardworking, that has established longterm,

15   important friendships, family relationships.  I think it was

16   the aunt of your girlfriend who put in the photograph.  And I

17   looked at that photograph quite a lot, because it made you

18   human, in a group, a large group of people, at a point in time

19   when you were under indictment, going through these trials.

20   And it's a statement about people's belief in you that's very

21   powerful, because it's a large family who embrace you and

22   embraced you.

23          So I look at that too and I think, this is not some

24   social -- you know, there's no pathology here that's evidenced

25   in any way that is pronounced in terms of some ability or

1    inability to create loving, supportive relationships.  Those

2    are the best indicia of where you'll be later in life.

3           So I then think about, OK, what are the purposes of

4    sentencing.  So now I know this individual has got parts of his

5    humanness that are parts that will be able to give back to

6    families to people to society down the road.  I also believe

7    that it's somebody who needs to be punished for what he did.

8    Where on the spectrum of between today and life do we stop?

9    It's a big range.

10           So what I think about is, what are the purposes of

11    sentencing?  How much do you need for personal deterrence?  How

12    much do you need for general deterrence?  How much do *you* need

13    for general deterrence?  How much of that should weigh on you

14    in your life versus spread out over a number of sentences over

15    time?

16           And I want to ensure that there aren't undue

17    sentencing disparities between you and other defendants or you

18    and other people who have committed fraud crimes in this

19    district.  And I think about all these things.

20           So where do I come out?  I come out higher than your

21    lawyer and lower than I was before I walked in here.  I come

22    out in a place where it is my view that a total sentence of ten

23    years, all together, is appropriate, is sufficient but not

24    greater than necessary.  It will serve the purpose of general

25    deterrence because the ten-year sentence will be known as a

1     ten-year sentence.  It will be referenced as a ten-year

2     sentence.  And that's a long time.  That's a big sentence.  48

3     months of that are split between Counts Three and Seven.  Count

4     Three is 24 months.  Count Seven is 24 months.  They are

5     consecutive to the remaining 72.

6            Did I get that right?  Let me do my math.  I just had

7     it written down.  Is that correct?

8            MR. SERCARZ:  You're correct.  120 months in total.

9            THE COURT:  120 months all together.

10           Now, I also take into account Mr. Sickler's piece.

11    I've already taken that into account.  I was actually, when I

12    walked out here, I will tell you that I was at 14 years.  And

13    as I think about it, it is my view that the ten-year sentence

14    will serve one of the primary purposes of general deterrence,

15    because it will be referenced as a ten-year sentence.  And so I

16    think that that is sufficient and not greater than necessary.

17           It is very important that I also take into

18    consideration the fact that you will be in deportation

19    proceedings after this and that I recognize that you will be in

20    a facility where you will not get time off for good behavior,

21    that you will not have the same kind of programs and

22    opportunities that other defendants will have, and that all of

23    those things serve to increase the way in which your time is

24    experienced as hardship.  And so therefore I think that the ten

25    years is an appropriate sentence here.

1    There will be also three years of supervised release.

2    And I should say, of the 72 months, the 72 months are for all

3    of the other counts, not Three and Seven, but all other counts,

4    for each one of them, imposed separately and to run

5    concurrently.  So that what we have is, Counts One, Two, Four,

6    Five, Six, Eight will be 72 months.  Counts Three and Seven

7    will be 24 months each, for a total of 120 months.

8    A three-year period of supervised release for all

9    counts, not Counts Three and Seven, all other counts.  One, you

10   shall cooperate in the collection of DNA.  Two, you shall not

11   possess a firearm or other destructive device.  Three, you

12   shall not commit another federal, state, or local crime.  Four,

13   you shall not illegally possess a controlled substance.  Five,

14   you shall refrain from the unlawful use of a controlled

15   substance and may be drug tested.  And, six, you must pay any

16   forfeiture obligation in restitution.

17   You have to provide the Probation Office with any

18   requested financial information, is a special condition, as

19   well as submitting your person, vehicle, place of residence to

20   reasonable searches as reasonably requested by probation.  You

21   shall not open any new credit card charges or credit lines

22   without approval of probation.  You shall notify the U.S.

23   Attorney's Office within 30 days of changing your residence.

24   You shall obey all immigration laws and directives of the

25   immigration authorities.

1          You shall report to the nearest probation office

2     within 72 hours of your release from custody.  And you shall be

3     supervised in your district of residence.

4          There's a special assessment of $800.  That's $100 for

5     each of the counts.  And I have to impose that and I do impose

6     that.

7          I'm not going to separately set a fine, because you

8     will have a very significant forfeiture and restitution

9     obligation, in the millions of dollars.  And I ask the

10    government, if it's still changing, to -- actually, the

11    restitution will be different -- to give the Court a final

12    order of restitution and forfeiture within 90 days.  The

13    forfeiture is for properties and be proceeds traceable to the

14    offense.  Restitution is for identifiable victims.  It's also

15    forfeiture of the amount that he had received.  As you folks

16    know, the law relating to forfeiture is different today than it

17    was in the early part of 2017.  And so the forfeiture amount

18    does take into consideration recent Second Circuit case law in

19    that regard and Supreme Court case law in that regard.

20         So I'm not going to state the amount unless you've got

21    an amount right now that can be stated.  Otherwise it's -- I'd

22    ask that you confer with counsel on the amount.  I believe

23    you'll be able to reach an amount where appeal rights are

24    maintained.

25         Mr. Cooper.

1          MR. COOPER:  Your Honor, we're still discussing with

2     Mr. Sercarz, we believe that the correct forfeiture amount is

3     $1,742,583.  I believe there may be a dispute between the

4     parties as to whether that's appropriate or whether a lower

5     number is appropriate.  We can put in a letter to the Court, in

6     the event that we're unable to reach an agreement in the next

7     few days, put in a letter outlining our position.

8          THE COURT:  All right.  Mr. Sercarz, would it be

9     acceptable to you if the Court left this proceeding open while

10    we do that?

11         MR. SERCARZ:  It is.  And so you understand the nature

12    of the dispute, I argued at three trials that the defendant did

13    not receive additional money from Tatto.  I remind the Court

14    that all the money that Mr. Wedd received came from Concise

15    Consulting, a business that was controlled by Paj, and I argued

16    using Government's Exhibit 1401 that he received the same

17    amount of money in total as Fraser Thompson, which is logically

18    inconsistent with the notion that my client was being paid on

19    two conspiracies rather than one.

20         I think we are going to agree on a great number of

21    properties which are going to be signed over to the government

22    in order to meet my client's forfeiture obligation.  I would

23    hope that the Court treats the issue of restitution in the same

24    way that it did with regard to Fraser Thompson, but I have a

25    feeling that the Court may be asked -- I have to talk further

1    with my client -- just to make a finding as to whether or not

2    the government's number concerning the forfeiture is correct.

3         THE COURT:  All right.  So why don't we do this.  Why

4    don't we keep the proceeding open for one week, only for the

5    purpose of solidifying the number relating to forfeiture and

6    for restitution.  If, after you folks have put in a letter or

7    dueling letters on that, if we need to have another session

8    where we go only over those amounts, we can do so.  If people

9    are prepared to have the Court rule and not require this

10   proceeding to be held with all of us in attendance, then please

11   let me know that and I'll be guided by you.  But certainly we

12   can be present in court if people believe that it's important

13   to do some.

14        So those amounts will be determined on consent after

15   this session today.

16        Is there any legal or other reasons why sentence

17   should not be imposed as stated?

18        MR. COOPER:  No, your Honor.

19        MR. SERCARZ:  No.  I have one request with regard to

20   designation, now or later.

21        THE COURT:  All right.  Let me just make sure I don't

22   forget these pieces.

23        I do impose sentence as stated.

24        There aren't any open counts.  He was tried on the

25   indictment.  Or are there, underlying?  There is no underlying

1    indictment, OK.  So that's dismissed.

2            Now, Mr. Wedd, you have a right to appeal.  Any notice

3    of appeal needs to be filed within 14 days of the filing of the

4    judgment of conviction.  If you cannot afford the cost of

5    appeal you can apply to have those costs waived.  It's called

6    proceeding in forma pauperis, and you have a right to apply to

7    proceed in that manner.

8            All right.  Now, Mr. Sercarz, I'm ready for your

9    request.

10           MR. SERCARZ:  Thank you.  It's a bit complicated, so

11   forgive me, your Honor.  In my conversations with Mr. Sickler,

12   he indicates to me that it's all but a formality and the

13   defendant is going to end up being designated to a contract

14   facility rather than one operated by the Bureau of Prisons.

15   But to the extent that there is flexibility and to the extent

16   that the Court wishes to see the defendant in an environment

17   where he has the same opportunities as other inmates, our

18   request would be that the defendant be designated, at least in

19   the first instance, to LFCI Allenwood in White Deer,

20   Pennsylvania, and be afforded the opportunity to participate in

21   the prison's institutional hearing program, to address removal

22   proceedings, and that the defendant not be designated to one of

23   the BOP's privately contracted facilities for sentenced aliens.

24           "The Court" -- and this is language we would ask the

25   Court to include -- "The Court does not want this defendant

I42AWEDSps

1    designated to Moshannon Valley CI."

2            I can hand this up to the Court.  You can rule on it

3    in any way you wish, your Honor.  That would be our request.

4            THE COURT:  All right.  Let me ask the government, do

5    they have any position one way or the other?

6            MR. COOPER:  No position.

7            THE COURT:  I will not order that, but I will make a

8    recommendation that will track that language.

9            MR. SERCARZ:  All right.

10           THE COURT:  All right.  The Court will make that

11   recommendation.

12           Is there anything further that we should do today?

13           MR. SERCARZ:  No.  Thank you.

14           THE COURT:  All right.  Thank you.  We are adjourned.

15                           o0o

16

17

18

19

20

21

22

23

24

25