**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

UNITED STATES OF AMERICA                    **15 CR 616-KBF**

- v. -

CHRISTOPHER GOFF,

                    Defendant.
------------------------------------------------------- X

---

## SENTENCING MEMORANDUM OF DEFENDANT
## CHRISTOPHER GOFF

---

May 7, 2018

Kenneth C. Murphy
RIVKIN RADLER LLP
477 Madison Avenue
New York, New York 10022
(212) 455-9555

Bradley D. Simon
SIMON & PARTNERS LLP
New York, New York 10176
(212) 332-8900

*Attorneys for Defendant*
*Christopher Goff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

I.    CHRIS'S PERSONAL HISTORY ............................................................... 1

II.   THE GUIDELINES AND 18 U.S.C. § 3553 ................................................ 6

    A.   18 U.S.C. 3553(a) ............................................................................... 7

        1.   The History and Characteristics of the Defendant
            (3553(a)(1)) – Works of Charity and Kindness ................................ 8

            a.   Chris's Dedication to His Immediate Family ...................... 9

                i.   Chris as a Husband ..................................................... 9

                ii.   Chris as a Father ........................................................ 10

            b.   Chris's Dedication to His Extended Family
              and Friends ......................................................................... 12

                i.   Chris's Conduct as a Son ........................................... 12

                ii.   Chris's Conduct as a Brother, Uncle,
                      Cousin and Friend ..................................................... 12

            c.   Chris's Dedication to His Community at Large ................. 14

        2.   The Nature and Circumstances of the Offense
            (3553(a)(1) ....................................................................................... 18

        3.   The General Purposes of Sentencing Will Be
            Satisfied By A Sentence Below the Advisory
            Guidelines Range (3553(a)(2)) ....................................................... 20

        4.   The Need To Avoid Unwarranted Sentencing
            Disparities Necessitates A Sentence Substantially
            Below the Advisory Guidelines Range 3553(a)(6) ........................ 22

        5.   The Kinds of Sentences Available (3553(a)(3)) .............................. 27

CONCLUSION ......................................................................................................... 28

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)..................................................................................................7, 8

*Irizarry v. United States*,
  553 U.S. 708 (2013)....................................................................................................7

*Pepper v. United States*,
  131 S. Ct. 1229 (2011)................................................................................................7

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008) (en banc)......................................................................6

*United States v. Keller*,
  539 F.3d 97 (2d Cir. 2008)..........................................................................................7

*United States v. Pope*,
  554 F.3d 240 (2d Cir. 2009)........................................................................................7

*United States v. Rigas*,
  583 F.3d 108 (2d Cir. 2009)........................................................................................7

*United States v. Whitman*, 12 Cr. 125 (JSR), 1/24/13.....................................................9

**Statutes**

18 U.S.C. 3553(a) ............................................................................................................7

18 U.S.C. § 371 ...............................................................................................................1

18 U.S.C. §1028(A) .......................................................................................................24

18 U.S.C. § 3553 .............................................................................................................6

18 U.S.C. §3553(a) ......................................................................................................6, 7

18 U.S.C. § 3553(a)(1) ....................................................................................................8

18 U.S.C. § 3553(a)(2) ...............................................................................................8, 28

18 U.S.C. 3553(a)(2)(A)-(D) .......................................................................................20

18 U.S.C. § 3553(a)(3) ....................................................................................................8

18 U.S.C. § 3553(a)(4)...............................................................................................8

**Other Authorities**

U.S.S.G § 2B1.1(b)(1)(J) .........................................................................................19

U.S.S.G. § 5F1.2 ....................................................................................................28

Darren Gowan, "Overview of the Federal Home Confinement Program,"...................28

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of defendant Christopher Goff ("Chris"), who is scheduled to be sentenced before this Court on May 18, 2018.  Chris pleaded guilty to one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371

Chris Goff is not the typical white-collar criminal defendant.  He has not lived the fast life, driven expensive cars, dined at the finest restaurants, or travelled first-class.  This is a simple man from humble beginnings, a baseball fanatic devoted to his wife and three sons, a man living a modest life near the beach in Southern California, a man far more likely to be seen at a Supercross motorcycle race than at a business networking event or in a Board room.  Nevertheless, he now stands before the Court a convicted felon in a serious white-collar prosecution.  No matter what the sentence in this matter will be, the sentence will have a lasting and serious impact on Chris and his wife and three small children (8, 6 and 4) for a long time to come.

We respectfully submit this sentencing memorandum on his behalf to ask the Court to consider Chris's life as a whole, the entirety of who he is, and not just the conduct that he engaged in willingly with Lin Miao, conduct for which he has paid (and will continue to pay) a very high price.  We respectfully ask the Court to impose here a non-Guidelines sentence for the reasons set forth below.

## I.      CHRIS'S PERSONAL HISTORY

Chris was born on October 22, 1976 in Kirkwood, Missouri, outside of St. Louis.  (PSR ¶ 86).  He has an identical twin brother, and when they were approximately four years old, the Goff family (Mom, Dad and the boys) moved to Thousand Oaks, California.  (PSR ¶ 87).

Chris was raised "to honor the lawful path, to not fear hard work and to care for others when possible."  (James Goff, p. 1, Ex. 1).  Approximately five years after the move to

California, when he was nine years old, Chris's parents got a divorce.  As for most children who experience divorce at that age, this was a difficult time for him, but he received counselling and his parents agreed to share custody.  As a result, he spent time between two households.

As a child, he was involved in every sport imaginable, including baseball, football, golf, wrestling, and track.  (Jeanne Grant, Ex. 21).  He has been described as a "joyous and energetic youth… exceedingly respectful and polite." (Robert W. Radley, Jr., Ex. 18).  Shirley Koeritz, now eighty-five years old, lived next door to Chris in California.  She worked for twenty-five years in a middle school, where she observed undoubtedly thousands of children.  She has written to the Court to describe her experiences with a young Chris Goff.  She described him as a good and decent youngster with a giving spirit (even as a teenager).  On one occasion, as she described, Chris and his brother worked to save her home from a flood when they volunteered and assisted her and her husband in the cold, pouring rain and mud to dig a trench to divert the flow of water and, thereafter, to clean up her home.  (Ex. 32; *see also* Jeanne Grant, Ex. 21).

Steven and Judy McGruder, parents of one of Chris's high school friends, described him as "an outstanding and considerate young man."  When he was in high school, "[h]e was always one of the first to be ready to lift heavy objects like ice chests, to help distribute food, help clean up.  He was always there when you needed help."  (Ex. 27).

Chris graduated from Thousand Oaks High School in 1995.  (PSR ¶ 102).  While in high school, he played multiple sports and also worked side jobs to support himself.  He worked as a newspaper delivery boy, a fast-food server at Carl's Jr., and as a salesperson at the Broadway Department Store (later taken over by Macy's).  (Chris Goff, Ex 1, PSR ¶¶ 134-137).

Because his parents could not afford to send him away to college, Chris attended Moorpark College, a local community school in Moorpark, California, where he played on the

2

football team until he was badly injured in an accident on the field and was forced to quit.  (Ex. 1, p. 3).

As he had in High School, Chris kept a very busy schedule working and also attending class.  He worked alternatively at jobs as security guard at the headquarters for Amgen pharmaceuticals, as a sales person for a pager retailer, and as a busboy and bartender at an Italian restaurant.  (PSR ¶¶ 126-133).  Because his schedule was so busy with work obligations, he was forced to take some classes at another local community college, Oxnard College, in Oxnard, California.  Nevertheless, after three hard years of work, he had truly earned himself (and paid for himself), his associate's degree from Moorpark.

During his freshman year at Moorpark, Chris had an argument with his mother (with whom he had been living).  This argument lead to Chris's mother directing him to leave her home, changing the locks in his absence, and forcing Chris and his brother to find somewhere else to live.  Chris slept on the couch at his friend's house and, at some point, along with his twin brother, slept outside in the bed of their truck.  Eventually, his father took him and his brother in. Notably, however, while his father was an extremely supportive and loving parent, he never found much financial success or even stability.  As a result, Chris and his brother had to support themselves, assisting in paying the rent and the utilities, while living in their father's apartment. As Chris has explained it, this was a significant event in his life, one that no doubt affects him even to this day.  (Chris Goff, Ex. 1, p.2).

After he graduated from Moorpark, Chris was accepted to San Diego State University. There too he worked his way through school.  This time, however, he worked at Celluphone, a retail cellphone business.  This was in or about 1999-2000, when cellphones were first really beginning to become commonly used among the general public.  (PSR ¶ 124).  This was Chris's

first real exposure to the cellphone industry.  After three years, in 2001, Chris finally received his

Bachelor of Science in Business Administration, with a focus on marketing, when he was

granted a degree from San Diego State University.  (PSR ¶ 100).

After he graduated, one of the first jobs Chris got was as a sales representative for

Verizon Wireless.  Travis A. Gilley, the owner of a chain of wireless retail stores, explained that

he met Chris during this time. He described a young Chris Goff as "extremely energetic, hard-

working and competitive" with an impressive work ethic.  As Mr. Gilley described it:

> He would often work late, helping my employees close sales and
> handle customer service issues.  Although Chris was my Verizon rep,
> he would often assist my Cingular (AT&T) or Sprint customers.  His
> main goal was to satisfy my customers' needs instead of merely lining
> his pockets with commission checks.  Chris may be the first rep I
> have ever met that was sincerely interested in improving the overall
> success of my business.  His work ethic and unselfish attitude
> impressed me so much that I recruited him to work for me as my
> Sales and Operations Manager.  Chris accepted the position and I feel
> he was a big reason for my company's success.

(Ex. 34, p.2).

Shortly after, Chris was hired by a friend's company, Pacific Export.  There he made his

first foray into marketing when he started a website at the company that lead to business

generation.  (Ex. 1, p. 3-4; PSR ¶ 118).  He then went on to work as an Account Manager at

Matrix Consultants where he further honed his skills in internet marketing.  During his time at

Matrix, he signed up for the internet dating website Match.com which, as he puts it, "changed his

life forever."  (Ex. 1, p. 4).  Through Match, he met Ryann Chance, who, as he explained it,

became his "best friend and the person [he] wanted to spend the rest of his life with."  (*Id.*)

In 2008, he landed his job at Mobile Messenger (also referred to as "MM").  While at

MM, the most important events in his life happened.  First, he married Ryann; then, he was

involved in a serious motorcycle accident that caused him physical pain for which he still suffers

to this day. (Ex 1, p. 4; PSR ¶ 94).  Shortly thereafter, in 2009, his "life changed for the better," when his first child was born.  (Ex. 1, p. 5).

Chris has described his time at MM as an exciting and new experience.  He was encouraged to build relationships with customers, to take customers to dinners and other social events, and to work with them at tradeshows.  His former superior at Mobile Messenger, Alexis Blum, described Chris as "always a very hard worker, truly passionate and 100% accountable for his work (deadlines as well as content)."  (Ex 48).  There was a fast-paced and aggressive culture at Mobile Messenger, a culture that was all about making fast and easy money, a culture that encouraged cutting corners and working a way around the rules.  It became a corporation that was quickly enmeshed in fraud and chicanery, including the scheme that Chris Goff soon willingly became a part of.

Specifically, in 2011, as the Court now knows, Chris was approached by one of his clients, Lin Miao.  Miao had already hatched his scheme to auto-subscribe PSMS customers that his company, Tatto, were marketing to, and he needed telephone numbers to do so.  In particular, he "needed Sprint and T-Mobile phone numbers," and he had "a great relationship" with Chris, and he knew Chris had access to those carrier's numbers.  (Tr. 241).  As Miao testified: "[Chris] was an account manager at Mobile Messenger.  And I knew he saw a lot of people that made a lot of money in the industry.  And he just received a salary from what he told me at Mobile Messenger.  He got passed through - he told me that he got passed through various promotions and that he wasn't happy about that.  I thought the opportunity of ten percent of a lot of money would excite him."  (Tr. 242).  Sadly, Miao was correct.  This was almost at the exact time when Chris's family began to grow, as his second son was being born.  As Chris has explained it:

> So when he approached me and asked me to sell him the numbers, I didn't ask
> any questions, I didn't press the issue, I did not want to know the details of what

he was doing, but I knew he was somehow subscribing customers without their permission. Although I did not know how he was doing it, I knew what he was doing. I knew better when I sold him those numbers and I am ashamed of my involvement and my decision. I think I just became blinded by the possibility of making real money, money that would have an immediate impact on my life. At the time, my salary was about $85,000, so a $10,000 check meant the world to me, it made life easier, not to mention a $30,000 check or a $50,000 check. And so it was. I never really gave any significant thought to what I was actually a part of, and for that, I am ashamed. I never saw myself as a criminal who was sticking his hand into someone's pocket and taking $10 but that is exactly what I was doing because I was a part of the process. I knew it was wrong but I ignored my own better instincts. I see things with a clarity now that I did not have then. I live with this shame every day for what I allowed myself to be a part of and will live with that shame for the rest of my life.

(Ex. 1, p. 5).

In 2013, Chris's third child was born. He managed to get a better paying job at the Social Programming Network but, after seven months, the company folded, and with three children at home under the age of four, he was unemployed. (Ex. 1, p. 6). Fortunately, within a relatively short period of time, he landed a job at Hallmark with their e-cards line. However, only a few weeks after starting that job, federal agents executed a search warrant at his home, he was charged in the instant offense and immediately fired from Hallmark.

Almost exactly three years later, Chris stands before this Court as a convicted felon awaiting sentencing for his role in the Mobile Messenger – Tatto scheme.

## II.    THE GUIDELINES AND 18 U.S.C. § 3553

As has been stated time and time again, although the United States Sentencing Guidelines (hereafter the "Guidelines") are not mandatory, sentencing judges must still "consider" them along with the factors listed in 18 U.S.C. §3553(a) (hereafter "3553(a)"). However, "[a] district court *may not presume that a Guidelines sentence is reasonable,* it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges, as a result, are generally free to impose sentences outside the recommended range." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (en banc)

(footnote omitted, emphasis added).  Moreover, the Court *must* consider all the sentencing

factors enumerated in 3553(a) and "make an individualized assessment based on the facts

presented."  *Gall v. United States,* 552 U.S. 38, 50 (2007); *see also United States v. Rigas*, 583

F.3d 108, 116 (2d Cir. 2009) ("[A] District Court must make an individualized assessment based

on all of the sentencing factors in § 3553(a)").

There is a distinction between a sentence that results in a variance from the Guidelines

based upon the Court's consideration of all the 3553(a) factors, and a sentence that is applied

below the Guidelines as a result of certain downward departures found within the Guidelines.

*See, Irizarry v. United States,* 553 U.S. 708, 709 (2013); *see also Pepper v. United States*, 131 S.

Ct. 1229, 1247 (2011); *United States v. Keller,* 539 F.3d 97, 100 (2d Cir. 2008).  Chris has a

Guidelines calculation of 23, which equates to a suggested term of imprisonment of between 46

to 57 months.  As agreed upon in the plea agreement, Chris does not seek a downward departure

from the Guidelines sentence set forth in the PSR; instead, he seeks a variance from the

suggested Guidelines calculation based upon the 3553(a) factors.

### A.   <u>18 U.S.C. 3553(a)</u>

The Second Circuit has never given specific guidance as to what weight should be given

to the advisory Guidelines range or the factors enumerated under § 3553(a).  It within the court's

discretion to determine what is reasonable under the circumstances of each case.  *United States v.*

*Pope*, 554 F.3d 240, 246-247 (2d Cir. 2009) (internal quotations omitted) ("Generally, if the

ultimate sentence is reasonable and the sentencing judge did not commit procedural error in

imposing that sentence, we will not second guess the weight (or lack thereof) that the judge

accorded to a given factor or to a specific argument made pursuant to that factor.")  More simply

put, the sentencing judge is entitled to find all the facts appropriate for determining either a

Guidelines sentence or a non-Guidelines sentence.  In this case, where Chris Goff's history and

character references are exceptional – other than his conduct here, he has lived a law-abiding and positive life filled with generosity and works of kindness for others; he has been a good son, father, husband and friend, and he has otherwise contributed significantly to his community, and where his conduct placed in relation to that of the other co-defendants previously sentenced, we submit that the 3553(a) factors weigh in favor of the imposition of a non-Guidelines sentence.

It is worth re-stating here the seven factors set forth for the Court's consideration in 3553(a):

- the nature and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1);

- consideration of the general purposes of sentencing, including: "the need for the sentence imposed-- "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; "(B) to afford adequate deterrence to criminal conduct; "(C) to protect the public from further crimes of the defendant; and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2);

- "the kinds of sentences available," 18 U.S.C. § 3553(a)(3);

- the Sentencing Guidelines, 18 U.S.C. § 3553(a)(4);

- any relevant policy statement issued by the Sentencing Commission, 18 U.S.C.; § 3553(a)(5);

- the need to avoid unwarranted sentence disparities, 18 U.S.C.; § 3553(a)(6); and

- the need to provide restitution to any victim. 18 U.S.C.; § 3553(a)(7).

*Gall v. United States,* 552 U.S. 38, 49-50, *fn.* 6.

## 1.    The History and Characteristics of the Defendant (3553(a)(1)) – Works of Charity and Kindness

"There is, in the common sense of it ... a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes.  And the notion, [is that] if our legal

system ever ceases to recognize that distinction, we will have lost our own humanity.  We will be a system without justice, without mercy, without feeling for the complexity of the human experience." *United States v. Whitman*, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr., at 27:25 - 28:8.

### a.   Chris's Dedication to His Immediate Family

Chris has time and time again, proven himself to be a dedicated family man who puts the interests of his wife and children above all else.

### i.   Chris as a Husband

Chris's dedication as a husband is not only evidenced by the letter of his wife, Ryann, but also by letters from Ryann's family.  Ryann's mother, for example, despite all that has occurred and the fact that Chris has placed himself in harm's way with his involvement in this matter, wholeheartedly continues to support him.  She described Chris as "a good man who feels enormous regret and shame for his actions."  She further explained that despite all that has transpired, she remains "grateful" that Chris is her son-in-law and the father to her grandchildren. "He is an amazing person who gives wholeheartedly to his family and community, and will continue to do so if given the chance."  (Linda Smelser, Ex. 12).

Ryann's brother, Eric, the Director of Information Technology for a non-profit organization in Philadelphia, explained how before asking Ryann to marry him, Chris got on a plane and flew to the East Coast (he and Ryann were living in Los Angeles) where he asked for the approval of Ryann's mother, sister and brother because their father had died years earlier.  As Eric Smelser described it: "My sister, Ryann, was married previously and my family and I were naturally protective.  Chris wasn't asking for our approval in a traditional matriarchal way, but wanted our blessing.  He sought out and listened to our advice and shared his hopes and plans.  It

was such a beautiful way to welcome us into their new family and allowed us to welcome him into ours." (Ex. 11).

Friends of the Goff family have also described what a loving and supportive husband Chris has been.  Jennifer Church, a lifelong friend of Ryann's, described how Ryann had endured a painful first marriage.  When Chris came into Ryann's life, it was remarkable for her to see the positive influence that Chris had on Ryann's life.  As she described it, "Chris provided [Ryann] with [the] support she needed and brought her smile back."  (Ex. 37). Another friend of Ryann's, Claire Rhinehart, described how nervous she was about her friend moving from Maryland to California.  She explained how Chris has steadfastly encouraged and cultivated Ryann maintaining her lifelong friendships back East.  Claire was amazed when she first met Chris how much he knew about her; but, as Claire described it: "I soon realized that for Chris, since we were important to Ryann, we were important to him.  That's one of the things I most admire about Chris; he not only supports his wife's needs and interests, he is actively proud of her personal and professional achievements."  (Ex. 36).

Michelle Antos, a parent in the Torrance neighborhood, described how Ryann has trained for various "Spartan" events.  These are intense athletic races that require long-term physical training and some travel to attend the competitions.  "When I would ask if Chris was ok with looking after the kids, Ryann would often comment how Chris had a homemade meal in the oven, laundry was done, and the house was clean and tidy."  (Ex. 29).

### ii.      Chris as a Father

Chris has been described as a "hands-on dad, changing diapers, staying home and taking care of them when they are sick, sitting with them as they finished their vegetables, and coaching them in baseball.  (Ellen and Robert Duffy, Ex. 30).  He is "[n]ot just a father but an involved

dad who … paints pinewood derby cars with his sons, teaches his sons to fish, disciplines when needed and loves his sons without hesitation or compromise."  (Shannon Goff, Ex. 7).

Jennifer Church, a Human Resources professional and a self-professed cynic when it comes to the intentions of others, described how Chris has "never let [her] down in terms of his intentions, commitment to others or role as a father."  Jennifer recounted a particular memory of Chris as a new father.  She was visiting the Goffs after the birth of their second child, Carson. Their eldest, Camden, was still a toddler.  Jennifer woke in the middle of the night to hear the baby crying.  She got out of bed, expecting to see her friend, Ryann, nurturing the babies; instead, she found Chris "rocking the newborn in one arm, and comforting his toddler in the other."  When she offered to help, his response was simply, "No – get some rest.  I've got this." Chris had to go to work in the morning while Ryann was the one home on maternity leave, nevertheless, he was happy to be there, hands-on, taking care of his boys and letting his wife get some rest.  According to Jennifer, Chris's dedication to his children has only increased over time. (Ex. 37).

According to Claire Rhinehart, a forty-three year old financial investment marketer, she "has never met a father who is more enthusiastically involved in the day-to-day, as well as the extracurricular activities of raising and guiding boys."  (Ex. 36).  He coaches not one, but all three of his children's baseball teams.  (Christian Hand, Ex. 41).

Many others have talked about how "one of the things people notice about Chris is the amount of time he spends with the boys." (John B. Smelser, Ex. 23).  "For example, for his birthday last year, he had to coach three baseball games for each of his three sons, and he told me that it was the perfect way to spend his birthday." (Robert Y. Imamura, Ex. 39).

11

Chris is clearly doing something right as a father.  Jennifer Church talked about how she has observed how Ryann and Chris have taught their kids about acts of kindness.  She has described how she has observed their eldest son asking Chris to pay it forward, to pick up the tab for a person behind them on line at a store.  (Ex. 37).  As noted, Francine Bostrom, the elderly neighbor has received offers from the off children to help her with some of her chores.  (Ex. 31).

### b.    Chris's Dedication to His Extended Family and Friends

Perhaps the true nature of a person can be seen in how he or she deals with their extended family and his community as a whole.  In that regard, Chris has exhibited acts of true charity and kindness that warrant consideration from the Court on his day of sentencing.

### i.    Chris's Conduct as a Son

As set forth in the PSR, and more fully in Chris's own letter, Chris had a tumultuous relationship with his mother.  He was kicked out of her home and forced to figure out alternative living arrangements at a relatively young age of 18.  Nevertheless, through Chris's efforts, he has endeavored to heal those wounds with his mother and include her in his own, tight-knit family as much as possible, inviting her to the children's activities and including her in family events.  By all accounts, it appears that he has been a good son to his mother.  According to her, Chris was a "caring youngster" who has grown into a "caring adult."  (Jeanne Grant, Ex. 21).

Chris has had a much stronger relationship with his father.  James Goff described Chris as not only his son, but also his friend.  His father described how, although they encountered financially challenging times, Chris "was always ready, willing and able to lend a hand to help in terms of support and comfort."  (Ex. 5).  For example, he worked to earn his college degree – tuition and books were not handed to Chris, he had to earn the money to get them.

### ii.    Chris's Conduct as a Brother, Uncle, Cousin and Friend

12

Chris's sister-in-law, Lorna Smelser, described his generosity towards her, whether it was simply lending her his car, making sure that his children call her directly to keep in touch with her or just checking in on her when she has gone through difficult periods in her life, he has always reached out to her to lend a helping hand.  (Ex. 13).

Shannon Goff, the wife to one of Chris's brothers, has told a story that really exemplifies Chris's nature and how, as she put it, he "has your back."  Shannon explained that not only is he the type of person to quickly volunteer to watch her children on a moment's notice, or to pick up another child from practice (when their parents could not) but he has also been known to undertake some really generous assistance to her in particular.  On one occasion, when she was pregnant with her second child, she contracted lice from another patient in the hospital.  The normal procedure for that infliction requires the individual to carefully and painstakingly comb through their hair and pick out the nits.  Chris's own brother (Shannon's husband) was not willing to do the task.  Hearing this, Chris dropped everything, went over to Shannon's home and "pick[ed] the nits out of [her] mortified, pregnant woman hair."  As Shannon stated, "here is this man stepping up to literally comb through my hair at a time when I felt gross, felt like I had to battle this all by myself, felt defeated – he, my brother-in-law, had my back."  (Ex. 7).

Meggan Zsemlye, M.D., a physician and one of Ryann's cousins, describes Chris's "good heart and kind nature."   She explained how Ryann moved across the country from her native Maryland to California, where their grandmother (called Nana by them) was living.  Before Ryann and Chris were even married, Chris "stepped up to provide care" to Nana.  "Chris was always willing to do anything necessary to help keep an elderly woman in her home – providing home repairs, helping with heavy lifting and driving Nana to her appointments and other places." (Ex. 24).   After Nana died, with the rest of Ryann's family living in other states, "Chris would

13

still look after the house and take care of things [that needed] to be done."  (John B. Smelser, Ex. 23).

To put it simply, Chris has proven himself to be a good family member and friend to others.  Perhaps Christian Hand summed it up best:

> While I am sure that many people write letters of reference for people all the time I really need to share my experience as to who I know Chris to be.  I'm not going to tell some dramatic story of how Chris saved me from drowning or pulled me from a burning car but I want you to know that Chris is one of the most loving fathers and giving people I know… During [my divorce] Chris was always there for me offering to help me move, to talk to take the boys so they could all hang out together and really just being there even if I didn't take him up on it.

(Ex. 13).

George Metalsky, who worked with Chris at Boingo Wireless from 2012-2014, commented on Chris's "tireless" work ethic, but, "more importantly [] his genuine care and concern for his co-workers and business contacts."  As Mr. Metalsky put it: "Whether this was taking meetings during inconvenient times, helping new hires feel comfortable or simply letting others cut in front of him at the morning coffee line, his empathy for others was refreshingly on display every day."  (Ex. 26).

### c.    Chris's Dedication to His Community at Large

Many letters describe how Chris has become a "key member of [his] neighborhood and community." (Edward Apodaca, Ex. 46).  Perhaps his most significant contribution is through his life-long passion for baseball.  He is a dedicated coach (for all three of his son's teams) and a member of the Governing Board for the Torrance Little League.  According to Belen Williams, a Licensed Clinical Social Worker with the Los Angeles County Department of Health, and the mother of two boys, "[w]e can go to the field any day of the week or weekend

and it is guaranteed that Mr. Goff will be there helping a team out, coaching a kid or getting the field ready for the next game." (Ex. 40).

"In a time when positive male influences that give back to the community and participate in the betterment of our kids [are] scarce," Chris has been a source of inspiration for many. (Edward Apodaca, Ex. 46). As stated by another parent, "in a time where children spend a majority of their time in front of TV and/or playing violent video games," Chris is promoting "confidence, integrity, compassion and leadership" through his volunteer work. (Belen Williams, Ex. 40). He is not only teaching these children about the game of baseball but, more importantly, "how to be a good teammate and work together to achieve goals." (Teal Lopez, Ex. 61).

As described by Sergio Fernandez, a grandfather to one of the children that Chris has coached:

> He goes out of way to teach each child adjusting to their abilities. He is a great father and coach. He is dependable – always arrives well before practice and game times. Keeps his promises to the kids – following through when the kids request a particular position. He gives the players encouragement and stresses for them to do their best. Chris is a great role model for these kids.

(Ex. 43).

As Brad and Tennille Allerheiligen described it, Chris is "energetic, extremely passionate and dedicated to teaching children the game of baseball." (Ex. 42). Chris not only taught their son the game, "he taught him integrity, dedication, teamwork and perseverance."

For Chris, it is just not about his children, it is about all of the children in Torrance and it is about his dedication to his community at large. For example, as described by Gina Fernandez, "[e]very year he offers to have practice with the kids for a couple of hours on Mother's Day – to

15

give the mothers some free time.  He also purchases all the moms/grandmas a flower for the kids

to hand out to us when we pick them up after practice."  (Ex. 44).

Cindy Hand, a friend from Redondo Beach, California describes Chris as a "natural with

kids."  She explained how her son, Russell, was always very shy.  Whenever she would drop

Russell off at the local pre-school and Chris was there, "he always made sure to encourage

Russell to participate in the morning activities that the other children were doing, so Russell

didn't feel isolated."  She too has explained how he is a positive father figure not only to his

three children but also to all the kids he coaches and mentors. (Ex. 47).

Peter Chang, the Management Services Officer at the University of California at Irvine

School of the Arts, explained how Chris is the type of man that supports the development of all

the youth in his community, not just his own.  (Ex. 45).   He provided the Court with specific

examples:

> Like me, my son is small for his age, a tempting target by larger boys.
> I gained a glimpse into Chris's character early on during last year's
> spring season when I shared with him how two boys were flipping my
> son Connor's hat off his head and playing keep away while in the
> dugout. I figured Chris would just brush off the incident – on the
> contrary and to my surprise, he asked the boys to come forward
> before the entire team at the next practice, asked them what happened,
> explained how it was not proper behavior, and then had the boys
> shake hands. The problem did not happen again.

(Ex. 45).  Peter further described how, even when Chris was no longer his son's coach, when

Chris was coaching the opposing team, he went out of his way to help Peter's boy.  During a

game, "[b]ased on prior innings, Chris recognized that my son would benefit from a lighter (and

longer) bat and called to his son to retrieve his bat in order for him to loan it to my son!" *Id.*

Other people, such as Robert Imamura, have noticed the same conduct.  No one doubts that Chris

Goff is competitive and wants to his team to win, but he goes out of his way to often assist the

16

children from other teams, giving them pointers on how to swing the bat or how to properly throw a baseball.  (Ex. 39).

Another example of Chris's dedication to all of the children in Torrance was described by Joseph M. Borges.  Mr. Borges described how Chris "opened his home to [their] Cub Scout den for an upcoming pinewood derby race," and took time with each of the seven boys participating, not just his own.  "His energy and enthusiasm were infectious … [h]e was always encouraging, providing a great amount of affirmation to each of the boys."  (Ex. 38).

There are many other examples of Chris's dedication to other children.  For example, Teal Lopez described how he went out of his way to take special care of a young boy on one of his teams who lost his mother and was forced to move away.  Chris made sure to give that boy a special send-off.  As Ms. Lopez explained it, "I am certain that Chris left a lasting impression on that very young boy." (Ex. 61).

A view of many of the letters reveals that Chris Goff has a natural way with children.  One tends to question whether Chris missed his calling and would have instead been better suited to a career in education, instead of marketing.  As Denise Metalsky put it, "[t]o say that Chris is great with kids is an understatement."  Her son, who was diagnosed with severe ADHD, can be quite difficult and has issues with his behavior and his impulsivity.  But "Chris sees him for who he is and treats him just like any other kid."  Mrs. Metalsky further explained,  "Chris and his wife have no problem taking him on without our supervision.  It is such a relief and joy to be able to spend time with a family that is understanding and open to our situation." (Ex. 25).

Chris's kind nature and caring spirit transcend simply youth and coaching.  He has shown a compassion for the elderly as well.  As explained by Francine Bostrom, an eighty-one year who is one of Chris's neighbors, Chris is "the neighbor everyone wants to have."  (Ex. 31).  She

described how her husband, Paul, also eighty-one, suffers from Parkinson's Disease. Unfortunately, as a result of Paul's condition, he often falls. Francine explained in her letter to the Court that she "can't count the number of times Chris has come across the street and picked Paul up and got him back into bed." Chris has insisted that Francine call him any time, day or night, when she needs assistance. In fact, when Chris was going to be away for an extended period of time last year, he made sure she had contact information for another Goff family member to call if she required help. She even described how Chris has offered to put up her Christmas lights. Finally, she explained how Chris has imbued in his boys the same giving spirit when she described how they come across the street to offer to take out her trash or water her flower beds. (Ex. 31).

### 2.    The Nature and Circumstances of the Offense (3553(a)(1)

As set forth in Chris's letter, he was approached by Lin Miao with an offer to purchase the telephone numbers and Chris agreed. Lin Miao, no doubt, knew that Chris Goff, a middle-management employee at Mobile Messenger, a new father making a modest income, would find it hard to turn down such an offer. Sadly, Lin Miao was right.

The offense is undoubtedly a serious one. Fortunately, however, it is not a crime that caused any one individual extreme financial hardship, to lose, for example, their life's savings or to go bankrupt. Nevertheless, we appreciate that even one additional charge of $10 on a cellphone bill, especially that of a poor or low-income person, matters to that individual and, therefore, we do not seek to minimize in any way the seriousness of the offense. Nevertheless, 3553(a)(1) does ask the Court to take account of the *nature and circumstances* of the offense. Chris was not an originator of the scheme. He was recruited by other, higher ranking members. Chris was not a stockbroker, lawyer or corporate executive empowered with great authority and control. Chris did not violate a fiduciary duty to a client or target a particular individual or entity

18

by his involvement.  He did not devise this plan or manage the execution of it.  He was given an

opportunity to make more money than he had ever made in his life in a short period of time and

he failed to follow his moral compass.  Perhaps one of Chris's former Mobile Messenger co-

workers said it best:

> Chris was not a high level executive or one of the members of upper
> management.  He was just a hard-working, middle management guy
> like the rest of us in an industry that, looking back, was kind of crazy
> at the time.  There was a culture at Mobile Messenger that was young,
> aggressive and, in retrospect, irresponsible.  Things just got that way
> so fast and I can only think that Chris got caught up in it.  He is not a
> flashy guy or a highroller, he was (is) just Chris Goff, a baseball fan
> with a smile on his face and enthusiasm every day.  I have come to
> conclude that Chris just got swayed by money being waved in front of
> his face that clouded his judgment.  I am  not making excuses for him,
> and I know he has pleaded guilty so it is what it is.  But I hope that
> your honor can understand that nothing I ever saw, and no one ever
> would have called Chris the type of person that was a liar, a cheater or
> a thief.

(Alexis Blum, Ex. 48).

In addition, his Guidelines calculation is significantly enhanced by the amount of the

reasonably foreseeable loss, U.S.S.G § 2B1.1(b)(1)(J).  This gives Chris an 18 point

enhancement for a loss more than $3,500,000 but less than $9,500,000.   Notably, however,

Chris's earnings for the sale of the numbers was approximately $350,000.  This is *ten percent* of

the *low end* of the Guidelines loss range.  While this Guidelines calculation is legally

appropriate, it skews the Guidelines range a bit higher than warranted by the actual nature and

circumstances of Chris's conduct.

Having said that, we fully acknowledge that Chris tried to take the easy way out and, for

that, he now will pay the price.  These are the nature and circumstances of the offense as pertains

to Chris Goff, in contrast to other economic crimes that this Court has seen as committed by

other white-collar defendants.

### 3.   The General Purposes of Sentencing Will Be Satisfied By A Sentence Below the Advisory Guidelines Range (3553(a)(2))

Title 18 U.S.C. section 3553(a)(2)(A)-(D) instructs courts to seek the following goals through sentencing: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide justice for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).

The offense for which Chris has pleaded guilty is indeed a serious one.  Chris clearly acknowledges this and shows his genuine remorse in his letter to the Court.  (Ex. 1).  Others, however, have observed Chris's remorse and genuine regret for his conduct as well.  "In our conversations about his troubles, he has never once tried to defend, minimize, or explain away his activities.  Nor did he try to shift moral blame to others."  (Joseph M. Borges, Ex. 38).

Travis A. Gilley related a particularly relevant description of how Chris has accepted responsibility for his actions, acknowledged his guilt and exhibited remorse:

> One final story that I would like to share with you, describes a conversation I had with Chris after he learned he was pleading guilty and may have to serve time for his crimes.   If you watched Chris interact with his children or with the young players on his teams, you would see how much these boys look up to him.  He is a very strong role model.  I asked Chris how he was going to explain his sentencing to his boys.  His answer surprised me.  In a way, I half-expected our conversation was going to be a brainstorming session.  I thought Chris and I would explore different communication tactics to skirt around the issue of a possible prison sentence.  I was hoping we could find an easy way to sugar coat this so he could minimize damaging his image as a role model to his children.   Instead of engaging in this type of conversation, Chris looked me dead in my eye and explained to me that he was going to do the opposite.  He was going to take a more direct approach.  He was going to tell his kids he did something wrong and he had to admit that he did so and face the consequences and was seeking forgiveness for what he had done.  Chris and his wife were going to use his sentencing as a learning experience for his

20

> entire family including his young boys about responsibility and even
> redemption.  He saw this event as an opportunity for his family to
> rally together.  I could tell that they were going to try use this
> experience to build strength and character in each member of their
> small, young family.  The way Chris handled this situation clearly
> demonstrates how much Chris has evolved as a person and I admire
> him for it

(Ex. 34).

No one could possibly look at the facts of this case (even if Chris were only given a short prison term) and believe that crimes like this are worth the risk.  The economic hardship that this conviction has caused Chris cannot be understated.  He has incurred huge debts to pay his legal fees and the expenses of travel and lodging here in New York, indeed, the financial costs now far outweigh any financial benefit that he received.  As his mother-in-law has stated, "Chris's guilty plea has lost him his job and will likely cause him to lose credibility and standing (as a coach, potential employee, etc.)"  (Linda Smelser, Ex. 12).  The loss of Chris's income, unfortunately, will likely "provoke Ryann to work harder to make ends meet, further absenting her from the children."  (Anne Piche-Radley, Ex. 16).

The damage he has inflicted on his small family cannot be underestimated either.  While it is undeniable that Chris will suffer deeply as a result of even one month of separation from his three young boys, the issue we ask the court to consider is how much it will affect the children rather than Chris.  Chad Smelser, M.D., one of Ryann's cousins, and a family member that has spent a great deal of time with Chris, put it simply:

> I know, due to his devotion to his children, that Chris will be
> devastated by being away from their lives while incarcerated, but
> more important for consideration is how incarceration, particularly a
> longer sentence, may affect the development of his children.  As a
> parent, pediatrician and public health official, I understand the risk of
> an absent parent to developing children, especially an incarcerated
> absent parent.

(Ex. 9).

Moreover, there is no basis to fear that Chris will again commit a crime. As Anne Piche, M.D., his aunt, has stated, "Chris has no previous history of unlawful or predatory behavior…[and] after this experience[,] he will be more circumspect about his associations and rigorous about adherence to the law." (Ex. 16). Indeed, Donald R. Piche, Professor Emeritus in Philosophy and Behavioral Sciences at Palomar College in San Marcos, California (and a relative who has known Chris his entire life) explained how he was "completely surprised to learn that Christopher had gotten himself into any kind of legal trouble much less something this serious. His legal situation is not consistent with the person [he has] known." (Ex. 15). From Prof. Piche's experiences with him, Chris has been nothing other than a "truly likeable, responsible and noble person." (*Id.*). Others have described being "shocked to hear that Chris had pleaded guilty to a federal crime," because, as they have stated, "it is just not consistent with the person [they] know." (Brad and Tennille Allerheiligen, Ex. 42). While not qualifying as "aberrant behavior" under the Federal Sentencing Guidelines, this conduct by Chris was no doubt out of character.

### 4. The Need To Avoid Unwarranted Sentencing Disparities Necessitates A Sentence Substantially Below the Advisory Guidelines Range 3553(a)(6)

As stated previously, Chris's applicable Guideline range is 46 to 57 months. In contrast, Darcy Wedd's Guidelines calculation after a conviction at trial was 120 *years* in prison for Counts One, Two, Four through Six, and Eight (the "Fraud and Conspiracy Counts"), to be followed by mandatory 24 months imprisonment on each of Counts Three and Seven (the "Aggravated Identity Theft Counts"). (ECF No. 677, p. 1). United States Probation ("Probation") recommended a 180 month sentence for Wedd. The Court ultimately sentenced Wedd to 72 months on the Fraud and Conspiracy Counts, followed by 24 months for each of the

22

two Aggravated Identity Theft Counts, for a total of 120 months imprisonment.  (ECF No. 700, p.3).

Fraser Thompson's Guidelines calculation after a conviction at trial was 168 to 210 months in prison for Counts Five, Six and Eight (the "Fraud and Conspiracy Counts"), to be followed by mandatory 24 months imprisonment on Count Seven (the "Aggravated Identity Theft Count").  Probation recommended a 144 month sentence for Thompson.  The Court ultimately sentenced Thompson to 36 months on the Fraud and Conspiracy Counts, followed by 24 months on the Aggravated Identity Theft Count, for a total of 60 months.  (ECF No. 654, p. 3).

According to the Government, Wedd "was at the epicenter of a massive fraud that stole money from millions of Americans.  He was remorseless for this conduct during the period of the conspiracy, and his lack of remorse extends to this day."  (ECF No. 677, p. 1).  Wedd played "a pivotal role" in the fraud and the victims lost millions because Wedd "directed his subordinates to sell those customers' numbers to co-conspirators, and then permitted those co-conspirators to auto-subscribe the customers whose interests he was supposed to be protecting."  (*Id.,* p. 6).  Miao testified that Wedd "was the only person that [Miao] could go to at that period of time" if he wanted to continue the fraud with Mobile Messenger.  (*Id.,* p. 7, Tr. 756).

Thompson, on the other hand, according to the Government, "was not a minor participant in the fraud.  Rather, he was an equal player – along with Wedd, Eromo, and [Pajaczkowski] – in carrying out the tasks that were necessary to make auto-subscribing with Zhenya a success, and in strategizing with the others about how to carry out the scheme in a manner that would be likely to evade detection."  (ECF No. 641, p. 5).

We submit that Chris was not at the culpability level of Thompson and, certainly, nowhere near that of Wedd.  Thompson was in the executive suites, according to the testimony, planning how to manipulate the scheme along with the other high-ranking corporate managers, Wedd, Pajaczkowski and Eromo.  This point is certainly not to say that Chris was innocent or a victim, but to put each player's respective role and responsibility in perspective as the Court must in any sentencing analysis under 3553(a)(6).  Despite their more substantial roles, and the significantly greater monies they earned on these schemes, Wedd and Thompson received sentences that were *significantly* below their respective Guidelines ranges.

In addition, it is also important to note that both Wedd and Thompson were sentenced for Aggravated Identity Theft (18 U.S.C. §1028(A)), which specifically requires that the sentence for such crime *must* be consecutive with any other conviction.  18 U.S.C. §1028(A) ("a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section.")  In other words, when this Court fashioned the sentences for Wedd and Thompson for the Fraud and Conspiracy counts, as required by statute, the Court crafted those sentences separate from the consecutive sentences for the Aggravated Identity Theft Count(s).  As a result, if one is comparing apples to apples, the sentences imposed on Wedd and Thompson for the Fraud and Conspiracy Counts (and not simply the aggregate, total sentences) are what should be considered by the Court in sentencing Chris.  With respect to Wedd, that is a sentence of 72 months, and with respect to Thompson, that is a sentence of 36 months.

Some simple math may serve to illustrate the range of sentences for Chris that would be consistent with the others.  With respect to Wedd, even ignoring the Guidelines calculation (which everyone appears to agree was wholly inappropriate under the circumstances), and

24

accepting the Probation recommendation of 180 months, the Court here *after trial* sentenced the former Chief Executive Officer, and the individual that, according to the Government, was at the hub of both conspiracies, to a sentence of 72 months on the Fraud and Conspiracy counts.  This was 40% of that which was recommended by Probation.[1]

With respect to Thompson, the Court sentenced him, after trial, to a sentence of 36 months on the Fraud and Conspiracy Counts.  This was approximately 21% of the low end of his Guidelines calculation.[2]  For Chris, a sentence of 40% of the low end of his Guidelines range would amount 18.4 months while a sentence of 21% would amount to 9.66 months.

We are, of course, mindful of the fact that Francis Assifuah, another co-defendant charged in the indictment with Chris, was sentenced within the Guidelines range found applicable to him.  However, when one compares Assifuah's conduct, the nature and circumstances of his offense, as well as his personal history and background, we submit that the Court could still vary from the Guidelines range with respect to Chris and, at the same time, fashion a sentence that satisfies all of the 3553(a) factors, including, the needs for just punishment for the offense, to promote the respect for the law and to satisfy the systemic goals of both specific and general deterrence.

First, Assifuah operated a content provider, Bleam Technologies.  As the Government stated, Erdolo Eromo met Assifuah at a trade show in Las Vegas, presented him with a plan to autosubscribe and then proposed using Bleam to do so.  After being emailed excel spreadsheets with the telephone numbers and having been given instructions on how to autosubscribe, Assifuah then used Bleam's systems to do so.  (ECF No. 498, p. 2).  While the period of Assifuah's involvement was shorter than that of Chris, Assifuah also received $600,000 in gross

---

[1] 72 months is 40% of 180 months.  (72/180 = .40).
[2] 36 months is approximately 21% of 168 months.  (36/168 = .2142).

payments for the scheme, significantly more than Chris did.  (*Id.* at p. 3).  From a criminality perspective, Chris was less involved than Assifuah, who had to create a computer platform to run auto subscription, corresponded about wiping and deleting servers, and worked to improve the system to make it undetectable.  Other co-defendants in the Bleam scheme however deemed his platform too unsophisticated and risky and it was terminated quickly.  (ECF No. 498, p. 3).

Even if the Court determines that Chris is on par with, or of comparable culpability to, Assifuah, we submit that the Court can still reasonably impose a sentence for Chris that is below the Guidelines range and also below that of which was given to Assifuah.  First, Assifuah had a prior domestic violence conviction for having assaulted his former girlfriend and this was not his first contact with the criminal justice system.  The Court, therefore, in sentencing him had reason to believe he might commit another offense, and a basis to think that insofar as this was Assifuah's second criminal offense, he did not deserve the benefits of a non-Guidelines sentence.  In contrast, Chris has had no prior run-ins with the law; indeed, in his personal life, he has been, by all accounts, a wonderful husband and father, not to mention a positive law-abiding member of his community.  This is his first contact with the criminal justice system; and, based upon all the testimonials given by friends and family, this will no doubt be his last.

In addition, as noted by the Government, Assifuah appeared not to accept responsibility for his own involvement in the scheme.  (*See* ECF No. 498, p. 5 (Government's sentencing submission noting, among other things, Assifuah's "continued refusal to accept responsibility for his actions" as one of the basis for a Guidelines sentence.)).  The same cannot be said about Chris who, in his letter to the Court, states: "Although I did not know how he was doing it, I knew what he was doing.  I knew better when I sold him those numbers and I am ashamed of my involvement and my decision."  (Ex. 1, p. 5).

Moreover, while we do not seek not to criticize, disparage or otherwise place a grade on how Assifuah has lived his life thus far, if one is to contrast the life he had lead up until his sentence – the people he has helped, the lives he has touched and the good works he has rendered – with those of Chris, the comparison is noticeable.  Chris Goff has lead a truly praiseworthy life thus far.  But for his involvement with Lin Miao, he has contributed regularly to everyone in his world, whether that was his wife, his kids, his parents, his friends and neighbors, etc.  He has "paid it forward" as one letter-writer described it.  If ever there is a time that a man or woman should be given some credit for a life well lived, for a life of generosity and good works, we respectfully submit it should be on judgment day at his federal sentencing.

Finally, the Court is aware that Jason Lee, one of the employees at Tatto who was involved in the scheme with Miao (cleaning up the phone number lists so that they could be used effectively in the spoofing program), was offered and accepted a plea to a misdemeanor charge.  We do not argue here that Chris and Lee are of equal culpability; nevertheless, it is worth noting that if Chris is given even the low-end of his Guidelines range (46 months), he stands to be sentenced to approximately four times what to which Lee will be sentenced (and that is only if the Court were to sentence Lee to the *maximum* potential sentence, 12 months, which seems unlikely).

Accordingly, when looking at *all of the defendants,* and the full range of sentences that have been handed down as a result of this prosecution, a below Guidelines sentence is justified.

### 5.      The Kinds of Sentences Available (3553(a)(3))

One of the factors to also be considered by this Court is the kind of sentences available.  The Court is not restricted only to a sentence of imprisonment.  The Court could also fashion a sentence of home detention, probation and/or community service, or any combination of the above.  Moreover, even if the Court deems that some term of imprisonment is necessary, the

Court could fashion a shorter prison sentence followed by a term of home confinement and community service.  Home confinement in the federal system may include a curfew, 24 hour-a-day "lock down," community service, probation or any combination of the above.[3]  The extent to which individuals are permitted to leave their residence is determined on a case-by-case basis, depending on the goals of supervision and the orders of the court.[4]  If the Court determines that the "amenities available in the residence of a defendant would cause home detention to not be sufficiently punitive," it is permitted to "limit the amenities available."[5]

This is the kind of case where a unique alternative sentence would be appropriate and justified to allow Chris to work to earn money in order to assist his wife and three young children.  Significantly, the Goffs have never been a family of means, even when both Chris and Ryann were gainfully employed.  With Chris in prison for an extended period of time, it will be exceedingly difficult (if not impossible) for Ryann to support three young boys and the household on her own.  A term of home confinement would severely limit Chris's freedom and serve as punishment, while at the same time allowing him to financially contribute to supporting his family (whether it be by driving the Uber as he is now or under some other restrictions the Court might impose).  This could also allow him to assist in running the household as Ryann continues to work in an attempt to bridge the gap between what is certain to be a severely reduced household income in the future.

We ask the Court to consider these alternatives to incarceration when fashioning a sentence that is sufficient but not greater than necessary.  18 U.S.C. § 3553(a)(2).

## **CONCLUSION**

---

[3] Darren Gowan, "Overview of the Federal Home Confinement Program," *Federal Probation,* p. 11 (December 2000).
[4] *Id.*
[5]  U.S.S.G. § 5F1.2, Application Note 2.

In the words of his wife, Ryann, "Chris feels extreme regret and sorrow for all his actions and decisions that led to where things stand today. He tells me regularly that he is so sorry and he knows it's his fault. He put his family in a dire situation."  (Ex. 2).  As a result, there must be punishment here as Chris, his family and his friends know.  Nevertheless, we respectfully seek some mercy from the Court for Chris.

We ask the Court to consider, in light of the life he has lived, his current familial circumstances, his role in the offense, the financial punishment he has already received as a result of his involvement and the sentences already given to the co-defendants, that the Court impose a non-Guidelines sentence.  Specifically, we ask the Court to consider imposing a sentence of 12 months imprisonment followed by a term of home-confinement and community

service in whatever term the Court feels is warranted under the circumstances.  We contend that in light of all that has occurred, that sentence would be sufficient but, at the same time, not greater than necessary to serve justice.

Respectfully Submitted,

Kenneth C. Murphy
RIVKIN RADLER LLP
477 Madison Avenue
New York, NY 10022
(516) 357-3154

Bradley D. Simon
SIMON & PSARTNERS LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

*Of Counsel:*
Terrence J. Johnson
Robert Gendelman

Dated: New York, NY
      May 7, 2018

3991768 v1